# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                           No. CR 16-4138 JB

EDWIN TORRES,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant Edwin Torres' Motion to Suppress Evidence, filed December 8, 2016 (Doc. 18)("Motion to Suppress"). The Court held an evidentiary hearing on February 16, 2017. The primary issues are whether: (i) Officer Jay Lucero's questioning of a passenger in Defendant Edwin Torres' car unconstitutionally extended a traffic stop in which Lucero discovered 38.5 pounds of methamphetamine in Torres' car; (ii) Torres consented to a search of his vehicle; and (iii) the Court should suppress evidence obtained during the vehicle search. The Court concludes that the questioning did not unconstitutionally extend the stop and that Torres' consent to the vehicle search was unequivocal, specific, intelligently given, and neither impliedly nor expressly coerced. The Court therefore denies the Motion to Suppress.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a  motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order

shall serve as the Court's essential findings for purposes of rule 12(d). The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Merritt, 695 F.2d at 1269.

1.      Nathan Jay Lucero has been a New Mexico Police Officer since 2001 and a K-9 handler for four years, during which time he has conducted approximately one thousand traffic stops. See Transcript of Hearing at 3:25-6:5 (taken February 16, 2017)("Tr.")(Lucero, Torrez).[1]

2.      Of the approximately one thousand traffic stops that Lucero has made, he has been the primary or secondary law enforcement officer on the scene for hundreds of stops that resulted in subsequent investigations of narcotics trafficking, vehicle searches, or requests to search a vehicle. See Tr. at 6:6-21 (Lucero, Torrez).

3.      At about 9:24 a.m. on September 29, 2016, Lucero stopped a grey 2015 Ford Fusion SE for speeding in the westbound lanes of Interstate 40 near mile marker 140 outside of Albuquerque, New Mexico. See DVD: NMSP Roadside Stop: Case # AL13WR16AL0047 - Torres 1:56-2:12 (United States Immigration and Customs Enforcement Sept. 29, 2016), filed February 16, 2017 ("Traffic Stop DVD").[2]

_____

[1]The Court's citations to the hearing's transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

[2]In United States' Response to Defendant's Motion to Suppress (Doc. 18), filed December 22, 2016 (Doc. 24)("Response"), the United States misreports the stop's date as May

4.      Lucero approached the vehicle's passenger side window, discovered that Torres was the vehicle's driver, observed that a female passenger -- Denise Guerra -- was resting in the vehicle's back seat, and noticed an overpowering odor of air freshener.  See Traffic Stop DVD at 2:14-2:30; Motion to Suppress ¶ 2, at 2 (asserting this fact); United States' Response to Defendant's Motion to Suppress (Doc. 18) ¶¶ 2-3, at 2, filed December 22, 2016 (Doc. 24)("Response to Motion to Suppress")(asserting this fact); Tr. at 13:12-20 (Torrez, Lucero); id. 19:19-20:4 (Lucero, Torrez).

5.      Lucero advised Torres of the reason for the stop, and asked Torres for his license, registration, and proof of insurance.  See Traffic Stop DVD at 2:40-2:42; Motion to Suppress ¶ 3, at 2 (asserting this fact); Response to Motion to Suppress ¶ 4, at 2 (asserting this fact).

6.      Torres provided Lucero with his license, registration, and proof of insurance.  See Traffic Stop DVD at 2:40-2:44; Motion to Suppress ¶ 3, at 2 (asserting this fact); Response to Motion to Suppress ¶ 4, at 2 (asserting this fact).

7.      Lucero noticed that Torres appeared to be very nervous, and he asked Torres to step out of the Fusion and meet Lucero in front of Lucero's patrol vehicle, a request with which Torres complied.  See Traffic Stop DVD at 2:50-3:11; Motion to Suppress ¶ 4, at 2 (asserting this fact); Response to Motion to Suppress ¶ 5, at 2 (asserting this fact); Tr. at 14:17-17:6 (Lucero, Torrez, Court).

8.      While Lucero wrote the citation, he asked Torres about Torres' travel plans, to which question Torres responded that: (i) he and Guerra were traveling to Amarillo, Texas, from California for a two-day vacation, see Traffic Stop DVD at 4:05-4:16; (ii) Torres did not have

---

29, 2016.  See Response ¶ 1, at 2.  This date differs from the date of September 29, 2016 found on: (i) the dashboard camera footage, see Traffic Stop DVD passim; and (ii) the Criminal Complaint, see Criminal Complaint 1, filed September 30, 2016 (Doc. 1).

family in Amarillo, <u>see</u> Traffic Stop DVD at 4:05-4:16; (iii) Torres did not have hotel reservations but was planning to book a hotel when he arrived in Amarillo, <u>see</u> Traffic Stop DVD at 4:16-4:42; and (iv) Torres and Guerra had left California the previous evening, <u>see</u> Traffic Stop DVD at 5:17-5:24.

9.      When the citation was almost complete, Lucero asked for Torres' permission to return to the Fusion to inspect the vehicle identification number ("VIN") and to speak with Guerra.  Traffic Stop DVD at 5:56-5:59; Tr. at 9:10-18 (Torrez, Lucero); <u>id.</u> at 12:21-24 (Lucero, Torrez).

10.      Torres provided his consent both to the VIN inspection and to Lucero's request to speak with Guerra.  <u>See</u> Traffic Stop DVD at 6:00.

11.      Lucero inspected the Fusion's VIN on the lower part of the driver's side window and on the driver's door jamb for no more than a few seconds.  <u>See</u> Traffic Stop DVD at 6:13-6:18; Tr. at 9:21-10:11; <u>id.</u> at 11:18-25; 37:10-22 (Lucero, Torrez).

12.      Lucero then engaged Guerra in conversation about her travel plans while she remained in the Fusion's back seat.  <u>See</u> Traffic Stop DVD at 6:19-7:03.

13.      Guerra reported that she and Torres were traveling to Texas for a two-day vacation, but she did not know the name of their destination city.  <u>See</u> Traffic Stop DVD at 6:30-7:03; Tr. at 14:5-12; 19:5-9 (Lucero).

14.      Lucero returned to Lucero's patrol car, and asked Torres whether he wanted to resolve the speeding citation by paying a sixty-six-dollar fine or contesting the speeding ticket in court in Albuquerque.  <u>See</u> Traffic Stop DVD at 7:41-8:15.

15.      Torres responded that he wished to pay the fine, and he signed the citation.  <u>See</u> Traffic Stop DVD at 8:16-8:19; <u>id.</u> at 10:06-10:33.

16.     Lucero handed Torres his papers and the citation, and told Torres that Torres was free to leave.  See Traffic Stop DVD at 11:15-11:16; Tr. at 20:11-21:1 (Lucero, Torrez).

17.     Torres began to walk to Torres' car, but Lucero asked Torres approximately seven seconds later whether Lucero could ask him some additional questions.  See Traffic Stop DVD at 11:13-11:25.[3]

18.     Torres turned and returned to Lucero's patrol car.  See Traffic Stop DVD at 11:21-11:25.

19.     Lucero again inquired into Torres' travel plans and Torres' relationship with Guerra before returning to the Ford Fusion SE and asking Guerra whether she could step out of the car for Lucero to ask her some additional questions.  See Traffic Stop DVD at 11:27-13:47; Tr. at 21:25-23:24 (Lucero, Torrez).

20.     Guerra exited the car, and Lucero asked her further questions about her and Torres' travel plans.  See Traffic Stop DVD at 13:48-17:

21.     Guerra told Lucero that: (i) she and Torres has planned the trip two days earlier, see Traffic Stop DVD at 14:27-39; (ii) Torres, contrary to what he had told Lucero, has family and friends in Amarillo, see Traffic Stop DVD at 16:45-16:50; and (iii) she had one pink-and-blue bag in the trunk, see Traffic Stop DVD at 17:32-18:13.  See also Tr. at 24:10-25:25 (Lucero).

22.     Lucero asked Guerra if she and Torres were transporting: (i) weapons; (ii) currency in excess of ten thousand United States Dollars; or (iii) drugs or narcotics.  See Traffic Stop DVD at 18:24-19:13.

_____

[3]Torres and the United States both report this amount of time at "[a]pproximately ten seconds."  Motion to Suppress at ¶ 17, at 4.  Accord Response ¶ 17, at 4.  Based on the dashboard camera video footage, the precise time was seven seconds.  See Traffic Stop DVD at 11:13-11:20.

23.     Guerra asserted that they were transporting none of these items.  See Traffic Stop DVD at 18:24-19:13; Tr. at 26:10-27:1 (Lucero).

24.     After questioning Guerra, Lucero returned to his patrol car and asked Torres whether Torres has any family members who live in Amarillo, to which Torres responded in the negative.  See Traffic Stop DVD at 19:14-19:30; Tr. at 27:10-17 (Lucero).

25.     Lucero further inquired how many pieces of luggage Torres had with him, to which Torres first responded that he had five pieces of luggage before revising that number to four and then revising it again to two.  See Traffic Stop DVD at 19:49-20:40; Tr. at 27:18-28:4 (Torrez, Lucero).

26.     Lucero then asked Torres whether Torres was carrying any weapons, large amounts of currency, or illegal substances in the Ford Fusion SE, to which Torres responded in the negative.  See Traffic Stop DVD at 20:43-21:20: Tr. at 29:3-20 (Lucero, Torrez).

27.     Lucero thereafter asked Torres for Torres' consent to a search of the Ford Fusion SE.  See Traffic Stop DVD at 21:04-21:06; Tr. at 29:19-30:9 (Lucero).  Torres inquired what would happen if he refused to consent to the search, to which Lucero responded: "I would deploy the dog around the outside of the car, and if my dog alerts, then what I could do is detain you and the vehicle and her and apply for a search warrant for the vehicle."  Traffic Stop DVD at 23:01-23:11.  See Tr. at 30:9-22; 45:17-23 (Lucero, Pori).

28.     Torres signed the consent form.  See Traffic Stop DVD at 23:11-23:41; Tr. at 30:22-25 (Lucero).

29.     Lucero searched Torres' person for weapons and then asked Guerra for permission to search her bag.  See Traffic Stop DVD at 24:20-24:24; Tr. at 35:6-17 (Lucero).

30.     Guerra consented to the search and signed the consent form.  See Traffic Stop DVD at 24:30-24:44; Tr. at 33:21-24, 35:2 (Lucero).

31.     Lucero searched the Ford Fusion SE and discovered 38.5 pounds of methamphetamine in the trunk inside two duffle bags.  See Traffic Stop DVD at 26:01-29:41.

32.     Lucero arrested Torres, see Traffic Stop DVD at 30:03-30:22, and handcuffed Guerra, indicating that she was under investigation for narcotics, see Traffic Stop DVD at 34:55-35:21.

## PROCEDURAL BACKGROUND

On October 25, 2016, a federal grand jury in Bernalillo County, New Mexico indicted Torres on the charge of unlawful, knowing, and intentional possession of more than five hundred grams of methamphetamine with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2.  See Indictment 1, filed October 25, 2016 (Doc. 10).  On November 2, 2016, Torres was arraigned before Judge Laura Fashing, United States Magistrate Judge for the United States District Court of New Mexico.  See Clerk's Minutes for Proceedings Before Magistrate Judge Laura Fashing, filed November 2, 2016 (Doc. 13).

### 1.     Motion to Suppress.

On December 8, 2016, Torres filed his Motion to Suppress.  See Motion to Suppress at 1. Invoking the Fourth Amendment to the Constitution of the United States of America's guarantee that "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures" shall not be infringed, Torres moves the Court to suppress all the evidence that Lucero seized on the day of Torres' traffic stop and arrest.  Motion to Suppress at 6, 25 (quoting U.S. Const. amend. IV).  According to Torres, searches without a warrant are presumptively unreasonable, and the United States bears the burden of proving the

reasonableness of a warrantless search.  See Motion to Suppress at 6 (citing United States v. Carhee, 27 F.3d 1493, 1496 n.2 (10th Cir. 1994); United States v. Finefrock, 668 F.2d 1168, 1170 (10th Cir. 1982)).  Torres asserts that there is no dispute that the evidence Lucero seized was obtained without a warrant, and that the United States therefore bears the burden to prove that Lucero's search was reasonable and not a Fourth Amendment violation.  See Motion to Suppress at 7.

Torres enumerates two categories of police-citizen encounters that may implicate Fourth Amendment protections.[4]  See Motion to Suppress at 7.  First, according to Torres, there is a consensual encounter, which Torres contends is not a seizure within the Fourth Amendment's meaning and needs not have suspicion or criminal wrongdoing that support it.  See Motion to Suppress at 7 (citing Florida v. Royer, 460 U.S. 491, 497-98 (1983)).  Second, according to Torres, there is an investigative detention, i.e., a "Terry stop," which is a seizure within the Fourth Amendment's meaning, and for which articulable facts must justify a reasonable suspicion that criminal activity "may be afoot" to justify such a stop.  Motion to Suppress at 7 (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)("Terry")).

Torres insists that no part of his traffic stop on September 29, 2016, was a consensual encounter with Lucero.  See Motion to Suppress at 7. To the contrary, Torres maintains, Lucero unreasonably and excessively detained Torres for much longer than necessary to complete a routine traffic citation when Lucero questioned Guerra.  See Motion to Suppress at 7-8.  Torres dismisses his verbal consent and signed consent form as illusory, and argues that he was unable to signal consent to the encounter on the grounds that he "only signed the consent after he considered Officer Lucero's claim of law, inevitable authority to search the vehicle."  Motion to

---

[4]Torres indicates that he will enumerate three categories, but he then enumerates only two.  See Motion to Suppress at 7-8.

Suppress at 8.  Torres asserts, therefore, that the Court must suppress the evidence Lucero seized during the warrantless, allegedly nonconsensual search on September 29, 2016.  <u>See</u> Motion to Suppress at 8.

Expanding upon his argument that Lucero measurably extended the traffic stop in violation of the Fourth Amendment, Torres again invokes <u>Terry</u>, which he reads as requiring that a traffic stop "must be both justified at its inception and reasonably related in scope 'to the circumstances which justified the interference in the first place.'"  Motion to Suppress at 8 (quoting <u>Terry</u>, 392 U.S. at 20)).  Torres asserts that an investigative detention must last no longer than is necessary to effectuate the stop's purpose and that the detention's scope must be carefully tailored to its underlying justification.  <u>See</u> Motion to Suppress at 8 (citing <u>United States v. Hunnicutt</u>, 135 F.3d at 1349).  Furthermore, Torres argues, a seizure that "'is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.'"  Motion to Suppress at 9 (quoting <u>Illinois v. Caballes</u>, 543 U.S. 405, 407 (2005)).  Within the United States Court of Appeals for the Tenth Circuit, Torres continues, "'[o]nce an officer returns the driver's license and registration, the traffic stop has ended and [all] questioning must cease; at that point the driver must be free to leave.'"  Motion to Suppress at 9 (quoting <u>United States v. Villa</u>, 589 F.3d 1334, 1339 (10th Cir. 2009)).

According to Torres, an officer making a traffic stop may properly request a driver's license and registration, run a computer check, and issue a citation.  <u>See</u> Motion to Suppress at 9 (citing <u>United States v. Walker</u>, 933 F.3d 812, 816 (10th Cir. 1991)).  Torres also concedes that an officer is entitled to inspect a VIN as part of a routine traffic stop.  <u>See</u> Motion to Suppress at 9 n.1.  Nevertheless, Torres maintains, an officer may not delay the cited motorist by asking the

motorist further questions once the motorist has produced a valid license and proof that he or she is entitled to operate the vehicle. See Motion to Suppress at 9 (citing United States v. Walker, 933 F.3d at 816; United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir. 1988)). Torres insists that the officer cannot detain the motorist for even a moment without reasonable, objective grounds for detaining him or her. See Motion to Suppress at 9-11 (citing Rodriguez v. United States, 135 S. Ct. 1609 (2015); Florida v. Royer, 460 491, 498 (1983)(plurality opinion)).

Torres insists that Lucero had the information he needed to complete a traffic citation within two minutes of stopping Torres, but that Lucero nevertheless "persistently and impermissibly" extended the stop's to almost nine minutes before telling Torres that he was free to leave. Motion to Suppress at 11-13. According to Torres, Lucero had no reasonable suspicion of criminal activity to justify extending the stop so much. See Motion to Suppress at 13. Torres describes Lucero's suspicion as nothing more than an "inchoate" "hunch" related to Torres' and Guerra's nervous behavior, their inconsistent explanation of travel plans, and the smell of air freshener. Motion to Suppress at 14. Torres contends that the "vast majority of the motoring public" is nervous when interacting with a police officer during a traffic stop, has unusual traffic plans, and uses air fresheners in it cars. Motion to Suppress at 14. Consequently, Torres argues: (i) Lucero had no reasonable suspicion of criminal activity; (ii) Lucero's acts to prolong the stop violated the Fourth Amendment; and (iii) the Court must suppress all of the evidence seized during the allegedly unlawful detention. See Motion to Suppress at 14-16.

Moreover, Torres contends, other facts seem to belie many of the facts that Lucero offers in support of his suspicions' reasonableness. See Motion to Suppress at 17. According to Torres:

> While Officer Lucero claims that Mr. Torres was nervous, the dashboard cam
> shows that throughout the encounter Mr. Torres was responsive, inquisitive and

> even joked with Officer Lucero about his relationship with [Guerra]. While
> Officer Lucero suggests that Mr. Torres and Ms. G[uerra] told an unbelievable
> and inconsistent travel tale, the dashboard camera reveals that the two described
> the classic American road trip through the Southwest -- a trip to Texas via New
> Mexico to sightsee where there they planed [sic] to spend two days in Amarillo
> and obtain lodging on their arrival before returning to California.

Motion to Suppress at 18. Torres insists that the "few inconsistencies" in his and Guerra's explanations were minor, and that they quickly corrected them. Motion to Suppress at 18. Torres avers that the Court should completely ignore any of the inconsistencies that emerged when Lucero questioned Guerra as he checked the Ford Fusion SE's VIN for another reason as well: "'[O]bservations made during an illegal detention cannot be used to bootstrap reasonable suspicion.'" Motion to Suppress at 18 (quoting United States v. Kaguras, 183 F. App'x 783, 788 (10th Cir. 2006)). Last, Torres maintains that the car smelled of air freshener, because he habitually kept the car "meticulously clean." Motion to Suppress at 18.

Torres then argues that neither he nor Guerra voluntarily consented to the vehicle search. See Motion to Suppress at 19-21. As Torres reads the law, the burden is on the United States to prove that Torres' and Guerra's consent was voluntary -- a burden that Torres further insists the United States cannot meet for multiple reasons. See Motion to Suppress at 20. First, Torres says, Lucero obtained Torres' and Guerra's verbal and signed consent for the vehicle search only by exploiting the prior excessive detention. See Motion to Suppress at 20-21. Second, Torres contends, the circumstances' totality make it clear that Torres consented to the vehicle search only after he "succumbed to Officer Lucero's express claim of lawful authority" to have a K-9 drug-sniffing dog circle the Ford Fusion SE. Motion to Suppress at 21.

Torres reads the law to require courts to accord three factors special weight when they determine whether consent to a vehicle search was free and voluntary after a motorist was unlawfully detained: (i) the seizure's temporal proximity to the consent; (ii) intervening

circumstances' presence; and (iii) the official misconduct's purpose and flagrancy. See Motion to Suppress at 22. Furthermore, Torres argues, voluntary consent consists of two parts: (i) law enforcement officers must receive either express or implied consent; and (ii) that consent must be freely and voluntarily given. See Motion to Suppress at 23. Torres asserts that neither he nor Guerra provided voluntary consent to the vehicle search, insofar as Lucero presented them with a Hobson's choice: he was going to search the vehicle "one of two ways -- the easy way or the hard way," i.e., with or without Torres' and Guerra's consent. Motion to Suppress at 24. According to Torres, his apparent consent to the search was "nothing more than a reluctant submission to Officer Lucero's claims [of] authority." Motion to Suppress at 25.

        2.      **Response to Motion to Suppress**.

The United States filed the United States' Response to Defendant's Motion to Suppress (Doc. 18) on December 22, 2016 (Doc. 24)("Response"). According to the United States, Lucero stopped Torres based on reasonable suspicion a crime was taking place: speeding on the interstate. See Response at 6. The United States argues that the stop was routine and complied with New Mexico State Police guidelines in that it did not extend the traffic stop unlawfully. See Response at 6. The United States maintains that Torres and Guerra engaged in a consensual encounter with Lucero after the traffic stop was complete, and that Lucero only searched the Ford Fusion after Torres and Guerra gave him their voluntary consent for the search. See Response at 6. Furthermore, the United States contends, Lucero had reasonable suspicion to hold the vehicle for extra time even if Torres and Guerra had not given their consent to the encounter and the vehicle search. See Response at 6. This reasonable suspicion, the United States explains, was based on: (i) Lucero's training and experience; (ii) the inconsistencies in Torres' and Guerra's answers to Lucero's questions about their trip; (iii) the unusual travel plans;

(iv) Torres' extreme nervousness; (v) the overwhelming smell of air freshener in the Ford Fusion; (vi) the numerous pieces of luggage for a purportedly short trip; and (vii) Torres' and Guerra's conflicting reports about their trip's purposes. See Response at 6-7.

Expanding on its arguments, the United States first asserts that the traffic stop did not exceed the length of time or scope necessary to accomplish its investigative purpose. See Response at 7. According to the United States, a traffic stop is reasonable as long as it (i) is justified at its inception; and (ii) is reasonably related in scope to the circumstances that justified the stop, i.e., lasts no longer than is necessary to investigate the traffic infraction. See Response at 7 (citing Illinois v. Carballes, 543 U.S. 405, 407 (2005); United States v. Hensley, 469 U.S. 221 (1985)).[5] As the United States sees it, there is no question that the stop was justified at its inception; Torres does not dispute that he was speeding. See Response at 7. The United States argues that there also is no doubt that the stop lasted only as long as was necessary to investigate the traffic infraction. See Response at 7-8. The United States asserts that courts rarely if ever conclude that a stop was unlawfully extended if it was completed in less than an hour. See Response at 8. The United States maintains that this stop -- completed in approximately nine minutes -- falls so short of what courts have deemed the minimum amount of time for an unlawfully extended stop that Court should not conclude that the Torres stop was extended. See Response at 8. Furthermore, the United States asserts, nine minutes, on its face, is not an unreasonable amount of time for a traffic stop. See Response at 8. The United States avers that a court should measure a stop's legitimacy by the length of time it takes an individual officer to write and issue a specific citation, and that Torres has offered no evidence Lucero did not take nine minutes to examine Torres' driving documents, examine the VIN, and complete the citation.

---

[5]The United States does not offer a pin cite when it cites United States v. Hensley. See Response at 7.

See Response at 8.  According to the United States, the law permits every action Lucero took during the nine minutes it took Lucero to write the citation.  See Response at 8-9.  The United States asserts that a police officer may: (i) examine the VIN on both a vehicle's dashboard and a vehicle's doorjamb as long as the officer remains outside the car, see Response at 9 (citing New York v. Class, 475 U.S. 106, 118-19 (1986); United States v. Ramos, 194 F. Supp. 3d 1134, 1140 (D.N.M. 2016)(Browning, J.)); (ii) direct ordinary inquiries incident to the traffic stop to the driver, see Response at 9-10 (citing, among many cases, United States v. Ramos, 194 F. Supp. 3d at 1157; United States v. Simpson, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010)); and (iii) direct ordinary inquiries incident to the traffic stop to any passenger, see Response at 10-11 (citing United States v. Ramos, 194 F. Supp. 3d at 1157).

The United States then shifts gears to argue that Lucero either had Torres' consent or had legal authority to detain Torres beyond the traffic stop's scope.  See Response at 11.  According to the United States, a police officer may detain a driver beyond the traffic stop's scope if the initial detention becomes a consensual encounter or the officer develops an objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity.  See Response at 11 (citing United States v. Rosborough, 366 F.3d 1145, 1148 (10th Cir. 2004); United States v. McGehee, 672 F.3d 860 (10th Cir. 2012)).[6]  The United States maintains that Torres freely consented to Lucero asking him questions.  See Response at 11.  In the alternative, the United States contends, Lucero had probable cause to extend the detention based on his reasonable suspicion that Torres was engaged in illegal activity.  See Response at 11.

Drilling into its argument that Torres freely consented to Lucero asking him questions, the United States says that, after the initial encounter, Lucero gave Torres the speeding citation

---

[6]The United States does not offer a pin cite when it cites United States v. McGehee.  See Response at 11.

and returned all of Torres' papers to him.  See Response at 11.  The United States contends that

the traffic stop ended at that moment.  See Response at 11.  As the United States sees it, Torres

demonstrated his free consent to Lucero asking him more questions when Lucero called out to

Torres and Torres returned to Lucero.  See Response at 11.  Invoking United States v. Laboy,

979 F.2d 795 (10th Cir. 1992), a decision that Judge Kelly wrote and that Judge McWilliams

joined, but from which Judge Brorby dissented, the United States asserts that the encounter after

the moment Torres returned to Lucero was consensual, and any encounter consensual encounter

"need not be supported by reasonable suspicion of criminal activity" if a reasonable person

would feel free to leave but chooses not to leave.  Response at 12 (quoting United States v.

Laboy, 979 F.2d at 798).

The United States maintains that the Tenth Circuit has identified various factors relevant

to whether a reasonable person would feel free to terminate an encounter with police.  See

Response at 12.  According to the United States, these factors include:

> The threatening presence of several officers; the brandishing of a weapon by an
> officer; some physical touching by an officer; use of aggressive language or tone
> of voice indicating that compliance with an officer's request is compulsory;
> prolonged retention of a person's personal effects such as identification and plane
> or bus tickets; a request to accompany the officer to the station; interaction in a
> nonpublic place or a small, enclosed space; and absence of other members of the
> public.

Response at 12 (quoting United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996)).  The

United States insists that Torres has offered no evidence of any of these coercive factors that the

Tenth Circuit identifies and avers that the "hypothetical reasonable innocent person would have

felt free to leave."  Response at 13.  The United States therefore concludes that all questions

following the initial traffic stop were consensual.  See Response at 13.

As the United States reports it, Torres also consented to the vehicle search after he consented to additional questioning. See Response at 13. The United States says that, when an individual gives free and voluntary consent to a search, the Fourth Amendment is not implicated. See Response at 13 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). According to the United States, the Tenth Circuit has delineated a two-part test for examining the voluntariness of the consent to a search. See Response at 13. First, the United States says, the government must show consent was unequivocal, specific, and intelligently given. See Response at 13. Second, the United States asserts, the government must show that the officers did not use implied or express duress or coercion. See Response at 13 (citing United States v. Sanchez, 608 F.3d at 690)). The United States maintains that consent to search may be voluntary even when the motorist is being detained. See Response at 13 (citing United States v. Dozal, 173 F.3d 787, 796 (10th Cir. 1999)).

The United States understands Torres to argue that his consent was not voluntary, because he was under implied or express duress or coercion. See Response at 14. The United States contends that Torres has not pointed to any physical coercion or to any trickery, basing his argument of lack of consent on Lucero telling Torres that he would get a police dog to sniff the car if Torres did not consent to the search. See Response at 14. According to the United States, there is no per se coercion when an officer makes a statement about future actions such as obtaining a warrant. See Response at 14 (citing United States v. Cruz-Mendez, 467 F.3d 1260, 1267-68 (10th Cir. 2006)). Furthermore, the United States maintains, Lucero's demeanor and voice were conversational, and nothing in Torres' reaction to what Lucero said indicated that he felt coerced. See Response at 15. As the United States recounts events, Torres continues to read the consent statement, which outlines all of Torres' rights, including the right to withhold

consent.  See Response at 15.  The United States also contends that Guerra did not show any evidence of feeling coerced.  See Response at 15.  Moreover, the United States continues, Torres cannot argue that a canine sniff would have been less intrusive than the physical vehicle search was.  See Response at 15 (citing United States v. Forces, 528 F.3d at 1273).  The United States concludes that Torres could have chosen to submit to a less intrusive search but chose the more intrusive search -- which, the United States contends, indicates that Torres was not coerced but freely and voluntarily consented.  See Response at 15.

Switching lanes, and arguing in the alternative, the United States then argues that Lucero had an objectively reasonable suspicion of criminal activity and, therefore, could legally detain Torres for additional questioning.  See Response at 15.  According to the United States, whether an officer has an objectively reasonable and articulable suspicion of illegal activity is evaluated under a totality of the circumstances standard.  See Response at 16 (citing United States v. Arvizu, 534 U.S. at 273).  The United States contends that the Tenth Circuit has identified a number of factors that may contribute to a reasonable suspicion, including: (i) internally inconsistent statements or inconsistencies concerning travel plans between a driver and passengers; (ii) bizarre travel plans; (iii) unusual signs of nervousness during a stop; (iv) evasiveness; (v) a previous criminal history; and (vi) driving rental vehicles.  See Response at 16 (citing United States v. Davis, 636 F.3d 1281, 1291-92 (10th Cir. 2011)).  The United States maintains that courts within the Tenth Circuit should accord deference to an officer's ability to distinguish between innocent and suspicious actions based on his or her experience and training.  See Response at 126 (citing United States v. Gandara-Salinas, 327 F.3d 1127, 1130 (10th Cir. 2003)).

As the United States sees it, there were at least six factors that contributed to Lucero's suspicion of illegal activity: (i) Torres was making a lengthy trip from California to Amarillo for a two-night stay; (ii) Torres had driven through the night; (iii) Torres and Guerra differed in their characterization of the trip and when they had planned it; (iv) there was a heavy smell of air freshener in the car; (v) Torres demonstrated extreme nervousness; and (vi) Torres' hand shook uncontrollably while Lucero was speaking with him. <u>See</u> Response at 16-17. The United States asserts that these factors do not raise a reasonable suspicion of criminality when taken alone and in isolation, but that the combination of these factors raises such a reasonable suspicion. <u>See</u> Response at 17. The United States therefore maintains that Lucero had grounds to detain Torres even if Lucero was factually incorrect about any of these factors. <u>See</u> Response at 17. The United States also insists that Lucero could detain Torres for the canine sniff, meaning that Lucero's statements to Torres were not coercive. <u>See</u> Response at 17. According to the United States, a canine sniff is a reasonable investigatory step to confirm or alleviate reasonable suspicions of criminal conduct provided that the length of time the motorist must be detained for the canine sniff does not amount to a de facto arrest. <u>See</u> Response at 17-18 (citing <u>United States v. Cervine</u>, 347 F.3d at 872; <u>United States v. White</u>, 544 F.3d 935 (10th Cir. 2009)).

Hedging its bets, the United States then argues that, should the Court conclude that there was illegal detention during the traffic stop, there was no causal connection between that illegality and Torres' consent to additional questions and a vehicular search. <u>See</u> Response at 19. The United States maintains that, under the Tenth Circuit's attenuation doctrine, evidence will be admissible if the government proffers objective evidence that establishes a break in the causal connection between the illegality and the evidence thereby obtained so that the consent is sufficiently removed to be an act of free will. <u>See</u> Response at 19 (citing <u>United States v.</u>

Sandoval, 29 F.3d 537, 543 (10th Cir. 1994)).  The United States insists that such a causal break occurred when Lucero returned Torres' documents and the speeding citation, and Torres began to walk to the Ford Fusion.  See Response at 19-20.  The United States contends that a second causal break occurred between when Lucero asked Torres additional questions, and when Torres and Guerra, independently and both verbally and in writing, consented to the vehicle search.  See Response at 20.  According to the United States, Lucero had a good-faith belief that Torres and Guerra consented to the vehicle search, and his conduct did not rise to the level of purposeful and flagrant official misconduct.  See Response at 20.  Consequently, the United State argues, the Court should: (i) deem Lucero's conduct to have been entirely reasonable and, therefore, legal; and (ii) deny Torres' Motion to Suppress.  See Response at 20-21.

### 3. **Reply to Motion to Suppress.**

Torres filed the Defendant's Reply to the Government's Response to the Motion to Suppress Evidence on January 8, 2017.  See Defendant's Reply to the Government's Response to the Motion to Suppress Evidence, filed January 8, 2017 (Doc. 27)("Reply").  Torres first revisits the assertion from his Motion to Suppress that he was seized during an excessive detention that measurably extended the traffic stop.  See Reply at 2.  Torres insists that Lucero lacked the legal or constitutional authority to prolong the traffic stop by looking at the Ford Fusion SE's VIN, or to engage Torres and Guerra in extended conversation -- which Torres characterizes as a "fishing expedition" -- about their travel plans.  Reply at 2-5.  Consequently, Torres contends, the Court is obligated to suppress all of the evidence that stems from Lucero's allegedly unconstitutional acts.  See Reply at 5.

According to Torres, Lucero continued to detain him after measurably extending the traffic stop.  See Reply at 5.  Torres says that a law enforcement officer may extend a traffic stop

beyond its initial scope only if: (i) the officer acquires a particularized and objective basis for suspecting the person stopped of criminal activity; or (ii) the driver voluntarily consents to additional questioning.  See Reply at 6 (citing United States v. Archuleta, 619 Fed. Appx. at 687).  Torres asserts that the United States cannot prove the first predicate, i.e., that Lucero had a reasonable suspicion of criminal activity.  See Reply at 6.  Torres also maintains that Torres' purported consent was insufficient to purge the taint of his allegedly unlawful detention, because (i) the time in between the end of the stop and the beginning of additional questioning -- and the similar time in between the questioning, and Torres' verbal and written consent to the vehicle search -- is too short; (ii) there were "no intervening events which broke the casual [sic] connection between the illegal seizures and the consent"; and (iii) Lucero purposefully and flagrantly violated the Fourth Amendment when he opened the car door to check the Vin on the doorjamb instead of just the VIN on the dashboard.  See Reply at 7-13.

### 4. **The Evidentiary Hearing.**

The Court held an evidentiary hearing on February 16, 2017.  See Draft Transcript of Hearing (taken February 15, 2017).[7]  After the parties and the Court took care of some preliminary housekeeping matters, the United States called Lucero to the stand.  See Tr. at 3:15-16 (Torrez).  Lucero stated that he had worked for the New Mexico State Police for sixteen years, first starting in the uniformed division in Santa Fe, followed by ten years as a detective and then the last four years as a certified K-9 handler.  See Tr. at 4:8-5:13 (Torrez, Lucero).  During his four years as a K-9 handler, Lucero testified, he had been involved in approximately one thousand traffic stops, hundreds of which resulted in vehicle searches or subsequent

---

[7]The Court's citations to the transcript of the hearing refer to the Court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

investigation for narcotics trafficking. See Tr. at 5:14-6:11 (Torrez, Lucero). Lucero asserted that he had been the primary officer on a majority -- perhaps up to ninety percent -- of these stops. See Tr. at 6:12-24 (Torrez, Lucero).

Recounting his version of the events of Torres' traffic stop, Lucero first noted that Torres told him that Torres was heading to Amarillo but did not know where he was going to lodge. See Tr. at 9:6-9 (Torrez, Lucero). Lucero then contended that Torres gave him permission to inspect the Ford Fusion's VIN and to talk with Guerra. See Tr. at 9:10-18 (Torrez, Lucero). It was important to check the VIN, Lucero explained, to check for vehicle theft, which Lucero indicated is a common crime in Albuquerque. See Tr. at 10:8-21 (Torrez, Lucero). Lucero said that he checks the VIN on approximately ninety-nine percent of the vehicles that he stops. See Tr. at 10:25-11:7 (Lucero). Lucero informed the Court that there are two places in a vehicle that display the vehicle's VIN: a VIN plate in the windshield and a federal VIN sticker on the driver's side front door's doorjamb. See Tr. at 11:18-25 (Torrez, Lucero). Acknowledging that he is not a professional VIN inspector, Lucero stated that his approach to inspecting VINs is to: (i) check the two rivets in the windshield VIN plate to see if they seem to have been tampered with or are different from each other; (ii) compare the last four digits on the vehicle registration with the last four numbers on the windshield VIN plate; (iii) look at the federal VIN doorjamb sticker to examine whether it has been torn off or seems to have be tampered with; and (iv) compare the last four VIN digits on the vehicle's registration with the last four digits on the doorjamb sticker. See Tr. at 12:1-16 (Torrez, Lucero).

Lucero then recounted how he had opened the driver's side front door of the Ford Fusion SE to talk with Guerra, because the noise from traffic on Interstate 40 otherwise was too loud for him to be able to hold a conversation with her. See Tr. at 13:4-14:5 (Torrez, Lucero). During

the conversation, Lucero testified, he asked Guerra where she and Torres were heading, and she did not know any location more specific than Texas. <u>See</u> Tr. at 14:5-8 (Lucero). When Lucero asked Guerra how long she and Torres would be staying in Texas, Lucero asserted, Guerra said that she thought they would be staying there for two days. <u>See</u> Tr. at 14:8-12 (Lucero).

Taking a step backward, Lucero then mentioned how nervous and fidgety Torres seemed to be throughout the stop, in contrast to motorists' normal behavioral arc -- an inverse cosecant in which the first few moments of the stop involve peak nervousness that increasingly diminishes as the stop proceeds. <u>See</u> Tr. at 14:13-16:5 (Lucero, Torrez). Lucero asserted that Torres' nervousness manifested itself in awkward comments, such as looking at the patrol car's lights and saying "Wow, those are red lights," extreme sweating despite cold weather, and shaking. Tr. at 16:6-17:6 (Lucero, Torrez). Lucero also noted that Torres' lack of planning for lodging and his speed of travel both seemed suspicious. <u>See</u> Tr. at 17:13-19:3 (Lucero). Lucero indicated that a strong scent of air freshener that he smelled in the car also had a whiff of suspicion to it. <u>See</u> Tr. at 19:19-20:10 (Lucero).

Fast forwarding to the end of the time period when he was issuing the speeding citation, Lucero then testified that he handed Torres' his documentation, license, and citation and then told Torres that he was free to go. <u>See</u> Tr. at 20:11-21:9 (Torrez, Lucero). Indicating that Torres turned and returned to the patrol car of his own free will after Lucero subsequently called out Torres' name, Lucero asserted that Torres granted Lucero permission to ask him additional questions. <u>See</u> Tr. at 21:10-24 (Lucero, Torrez). Once he reengaged Torres in conversation, Lucero said, he pressed Torres to explain why he and Guerra had chosen to vacation in Amarillo rather than a more exciting city such as Las Vegas. <u>See</u> Tr. at 21:25-23:24 (Lucero, Torrez).

Lucero recounted that he then conversed with Guerra again as well. See Tr. at 24:8-10 (Lucero). Guerra indicated that she and Torres were going to "Armadillo," and that -- even though she needed to be back to work in California in a few days -- she and Torres had not booked a hotel, because they were not on a time schedule. See Tr. at 24:10-19 (Lucero). Lucero stated that Guerra also asserted that: (i) she could not remember precisely when she and Torres had planned the trip; and (ii) she and Torres were not in a romantic relationship, an assertion that Lucero believed to be at odds with Torres' earlier statement that he was "try[ing] to make Guerra his girlfriend." Tr. at 24:19-25:6 (Lucero). According to Lucero, Guerra then told him that Torres has friends and family members in Amarillo, which stoked Lucero's suspicions further, because Torres had maintained that he did not have any family in the city. See Tr. at 25:6-14 (Lucero).

As Lucero reported the ensuing chain of events, he then asked Guerra whether she had any luggage in the Ford Fusion. See Tr. at 25:18 (Lucero). Lucero asserted that Guerra revealed that she had one pink and blue bag in the trunk. See Tr. at 25:19-25 (Lucero). Lucero recounted that he then asked Guerra whether she was responsible for the contents of everything in the vehicle, to which he said she responded that she only was responsible for the contents of her own bag. See Tr. at 25:25-26:2 (Lucero). His suspicions further aroused, Lucero asserted that he then barraged Guerra with questions about many categories of contraband that might be in the car: weapons, handguns, rifles, currency in excess of ten thousand dollars, cocaine, methamphetamine, heroin, or marijuana. See Tr. at 26:3-27:1 (Lucero). According to Lucero, Guerra answered each question in the negative and with the same way before giggling as she averred that there was no methamphetamine in the car and then reverting to her standard cadence and tone in subsequent denials. See Tr. at 26:17-25 (Lucero).

Returning at that point to his interactions with Torres, Lucero indicated that he then asked Torres whether he had family in Amarillo, to which Torres responded that he did not have any family there. See Tr. at 27:9-17 (Lucero). Lucero stated that he then asked Torres how much luggage he was carrying with him. See Tr. at 27:21-22 (Lucero). According to Lucero, Torres said that he had five bags, a number he quickly revised to three bags and then again revised to three bags. See Tr. at 27:24-28:5 (Lucero). Lucero testified that he found such a large number of bags -- whether three, four, or five -- to be suspicious, because: (i) Torres and Guerra were on a two-day trip; (ii) Guerra asserted that she only had one bag; and (iii) in Lucero's experience, women generally pack more for a trip than men pack. See Tr. at 28:8-20 (Lucero). Lucero contended that he then asked Torres whether there was any contraband in the Ford Fusion, to which Lucero asserted Torres said "I don't believe so." Tr. at 29:3-13 (Lucero). Lucero asserted that this statement seemed suspicious in that motorists he stops usually categorically state that there is no contraband in their cars. See Tr. at 29:7-13 (Lucero). Lucero then recounted how he asked the same rapid-fire questions of Torres that he had asked of Guerra about the presence of various categories of contraband in the car. See Tr. at 29:13-17 (Lucero, Torres). According to Lucero, Torres indicated that there was no contraband in the car, whereupon Lucero said he asked Torres for permission to search the vehicle. See Tr. at 29:18-19 (Torrez, Lucero). Lucero asserted that Torres read the search consent form and then asked Lucero what would happen if he refused to consent to the search. See Tr. at 29:19-30:11 (Lucero). Lucero recounted that he told Torres that, if Torres did not consent to the search, he would have a canine sniff around the outside of the Ford Fusion SE, and would then detain Torres and apply for a search warrant if the dog alerted him to the presence of any narcotic. See Tr. at 30:10-22 (Lucero). Lucero said that Torres then voluntarily signed the consent form. See Tr. at 30:22-31:6 (Lucero, Torrez).

Lucero testified that, after Torres has signed the search consent form, Lucero reconfirmed with Guerra that she was telling him that there were no narcotics in the car and then asked for her consent to the vehicle search. See Tr. at 33:11-21 (Lucero, Torrez). According to Lucero, Guerra signed the consent form and indicated that she had no questions about it, and then Lucero told her that she was free to go. See Tr. at 34:1-5 (Lucero). Before she left, however, Lucero clarified, he asked her to take off her outer layer of clothing -- a sweater -- in full view of the patrol car's dashboard camera so that he could assess whether she was armed or otherwise dangerous without performing a pat down like one that he had performed on Torres. See Tr. at 35:3-22 (Torrez, Lucero). Lucero said that another officer then arrived on the scene after being dispatched there for an officer welfare check, and that officer assisted Lucero in the vehicle search. See Tr. at 36:1-14 (Lucero, Torrez).

Torres then began to cross-examine Lucero. See Tr. at 36:21-22 (Pori, Lucero). Torres first asked Lucero whether he had all the information he needed -- aside from whether Torres planned to contest the speeding citation -- to complete the citation by the time he approached the Ford Fusion to check its VIN. See Tr. at 36:23-37:3 (Pori). Lucero asked in the affirmative. See Tr. at 37:4 (Lucero). Torres then asked Lucero how he checks VINs, to which Lucero began to recite the same protocol that he had described during direct examination: checking the last four digits and the two rivets on the windshield VIN plate. See Tr. at 37:10-22 (Lucero). Torres asked Lucero how long it took him to inspect the windshield VIN plate, to which Lucero responded that it took him no longer than a "couple of seconds at the most." Tr. at 38:21-39:7 (Pori. Lucero). Torres then inquired how he went about inspecting the federal VIN sticker on the driver's side front door's doorjamb and whether he was engaged in conversation with Guerra the balance of the time when he had the front door open. See Tr. at 39:11-41:25 (Lucero, Pori).

Lucero explained his process for inspecting the doorjamb VIN and confirmed that he was speaking with Guerra the rest of the time that the front door was open. See Tr. at 39:11-41:25 (Lucero, Pori).

Torres asked Lucero whether another vehicle that the dashboard camera video showed parked in front of the Ford Fusion SE was another state police patrol car, to which Lucero responded that it was not. See Tr. at 42:7-43:22 (Lucero, Pori). Seemingly caught off guard, Torres briefly shifted questioning to differences in the uniforms of the criminal enforcement and patrol divisions of the state police before landing on a question about how a K-9 vehicle search unfolds. See Tr. at 43:23-45:17 (Pori, Lucero). Torres asked Lucero if it would be accurate to say that Lucero earlier had testified that he told Torres that he would send a dog around the Ford Fusion SE if Torres declined to consent to a vehicle search. See Tr. at 45:17-22 (Pori). Lucero confirmed that characterization was correct. See Tr. at 45:23 (Lucero). Torres then inquired whether Lucero believed that he had reasonable suspicion to deploy the dog, to which Lucero responded that he believed himself to have such reasonable suspicion. See Tr. at 45:24-46:2 (Pori, Lucero). Torres then asked why Lucero did not deploy the dog and forego trying to secure Torres' consent to the vehicle search, to which Lucero responded that he always asks for consent to search and that it was so easy to uncover the narcotics during this search that he did not need to deploy the dog. See Tr. at 46:3-47:5 (Pori, Lucero).

Torres then probed precisely when Lucero felt he had reasonable suspicion to detain Torres, which the ensuing colloquy between Torres and Lucero during the hearing pegged at some time before the time that Torres began to walk back to the Ford Fusion with his documents

and the speeding citation in hand.  See Tr. at 47:6-53:6 (Pori, Lucero).[8]  After a short break,

Torres recommenced his cross-examination of Lucero.  See Tr. at 53:17 (Pori).  Torres asked

Lucero whether one of the factors that aroused Lucero's suspicion of criminal activity was

Torres' nervous behavior, to which Lucero responded that was one factor.  See Tr. at 53:17-21

(Pori, Lucero).  Torres inquired whether the video shows Torres shaking or sweating, or whether

the audio reveals his voice cracking, to which Lucero conceded that the video and audio do not

reveal these categories of nervous behavior.  See Tr. at 53:22-54:2 (Pori, Lucero).  Torres then

questioned whether the video shows Torres nervously shifting from foot to foot and then, when

Lucero said that the video shows this movement, suggested that the footwork might be Torres'

natural behavior to try to keep warm in cold weather.  See Tr. at 54:17-55:7 (Pori, Lucero).

Seeking to call into doubt the reasonableness of Lucero's suspicion regarding Torres' and

Guerra's lack of a confirmed hotel reservation for the evening of the stop, Torres then asked

Lucero whether he was familiar with smartphone applications such as Hotel Tonight,

Hotels.com, and Trivago that enable one to book a hotel room at the last minute.  See Tr. at

55:17-23 (Pori).  The United States objected that there is no evidence that Torres had such

smartphone applications on his smartphone.  See Tr. at 55:24-56:1 (Torrez).  The Court

overruled the objection, and Lucero responded that commercials had made him aware that such

last-minute hotel booking smartphone applications exist.  See Tr. at 56:2-6 (Court, Pori, Lucero).

Seeking to puncture Lucero's argument that Torres' and Guerra's differing accounts of

their travel plans was suspicious, Torres first repeatedly attempted to get Lucero to say that

Guerra may simply have been tired when she gave her account of her and Torres' itinerary

---

[8]Lucero initially indicated that he did not have reasonable suspicion at the time Torres began to walk back to the Ford Fusion, see Tr. at 47:20-25 (Pori, Lucero), but he then revised his estimate after Torres presented him with a copy of the police report that he had filed about the stop, see Tr. at 49:18-22 (Pori, Lucero).

before withdrawing the question under the United States' objection when Lucero did not make this concession.  <u>See</u> Tr. at 56:7-58:15 (Pori, Lucero, Torrez).  Torres then shifted gears to a line of questions about the air freshener that Torres asserted Lucero claimed was overpowering.  <u>See</u> Tr. at 63:8-13 (Pori).  Torres presented photographs of the Ford Fusion SE's interior and asked Lucero whether he saw more air freshener than one air freshener hanging from the rearview mirror.  <u>See</u> Tr. at 63:16-65:18 (Pori, Lucero).  Lucero responded that he saw only the one air freshener.  <u>See</u> Tr. at 65:18 (Lucero).

The United States then began its redirect of Lucero.  <u>See</u> Tr. at 66:4 (Torrez).  The United States first asked Lucero to clarify whether he had any contact with the sheriff's vehicle that the video showed parked in front of the Ford Fusion.  <u>See</u> Tr. at 66:5-10 (Torrez).  Lucero stated that he had no communication with it either before or during the stop, and he noted that the sheriff's patrol vehicle had already been parked on the side of the road when he pulled over Torres for speeding.  <u>See</u> Tr. at 66:9-15 (Lucero).  The United States asked Lucero whether he ever arrested anyone under New Mexico statute for failing to obey a police officer, to which Lucero responded that he had not even known about the statute, let alone ever having used it to arrest someone. <u>See</u> Tr. at 68:21-69:7 (Torrez, Lucero).  The United States then requested that Lucero summarize for the Court what factors he considered suspicious during the traffic stop.  <u>See</u> Tr. at 70:4 (Torrez).  First, Lucero mentioned the minimum thirty-hour round-trip drive for what Torres and Guerra alleged was a two-day vacation in a city without any tourist attractions of note.  <u>See</u> Tr. at 70:5-71:18 (Lucero, Torrez).  Second, he pointed to the seemingly differing accounts that Torres and Guerra provided him about their relationship status.  <u>See</u> Tr. at 71:18-22 (Lucero).  Third, he noted Guerra's lack of specific knowledge about her and Torres' destination despite having ridden in a car alone with him for at least ten or eleven hours.  <u>See</u> Tr. at 71:22-24 (Lucero).

Fourth, he identified Guerra's inconsistent reports of when she and Torres had planned the trip. See Tr. at 71:24-72:2 (Lucero). Fifth, Lucero referred to Torres' inconsistency regarding how many pieces of luggage he had with him. See Tr. at 72:6-15 (Lucero). Sixth, he mentioned Torres' and Guerra's inconsistent accounts about whether Torres has family living in Amarillo. See Tr. at 72:15-18 (Lucero). Seventh, he noted Torres' answer that he did not believe that there was contraband in a car registered to him and his sister, and which he had been driving for hours cross country. See Tr. at 72:18-73:22 (Lucero). Eighth, he referred to what he deemed to be Torres' excessive nervousness, a nervousness that ratcheted up throughout the stop rather than subsiding as typically occurs when Lucero stops motorists. See Tr. at 73:25-75:5 (Lucero).

Lucero then reasserted that Torres freely gave him consent to ask him additional questions and to search the vehicle, and that he solicited Torres' permission to speak with Guerra as well. See Tr. at 75:6-20 (Lucero). He also reiterated that checking VINs is standard operating procedure in Albuquerque given the prevalence of automobile theft in the city. See Tr. at 75:21-76:8 (Lucero, Torrez). With that exchange completed, the United States closed Lucero's redirect. See Tr. at 76:9 (Torrez).

Danny Garcia, an investigator with the federal defender's office, then took the stand. See Tr. at 76:23-77:3 (Wild, Garcia, Pori). Garcia testified that he formerly was a detective in the Albuquerque Police for more than twenty-two-and-a-half years, including a twelve-year span during which he was detailed to the United States Bureau of Alcohol, Tobacco, and Firearms. See Tr. at 77:4-20 (Garcia, Pori). Torres had asked Garcia to research where the VIN is located on a 2015 Ford Fusion SE -- the make and model of the car that Torres was driving when Lucero stopped him for speeding. See Tr. at 77:24-78:2 (Pori, Garcia). Garcia asserted that he had completed the research as requested by looking up the information on the Internet and verifying

this information by looking at a 2016 Ford Fusion SE at a local dealership.  See Tr. at 78:5-9

(Garcia).  According to Garcia, a salesperson at the dealership advised him that the VIN location

is identical on the Ford Fusion SE's 2015 and 2016 model year sedans.  See Tr. at 78:11-15

(Garcia).

Torres moved the Court to admit into evidence photographs of the 2016 Ford Fusion SE's

windshield VIN plate and doorjamb VIN sticker, which Garcia assured the Court accurately

represent the two VINs' location in the 2015 Ford Fusion SE as well.  See Tr. at 79:10-81:7

(Garcia, Pori).  Torres also moved the Court to admit into evidence two photographs of Garcia

mimicking Lucero's positioning during the traffic stop by (i) standing at the front driver's door

of the 2016 Ford Fusion SE and gazing down at the doorjamb VIN sticker; and (ii) sticking his

head inside the car's driver's compartment.  See Tr. at 81:8-82:17 (Garcia, Pori).  The United

States objected to the simulated reconstruction insofar as video of the traffic stop exists and is the

best evidence, but the Court admitted the two photographs as Torres requested, because the

Court concluded that the photographs have some probative value.  See Tr. at 82:18-83:3 (Torrez,

Court).  Torres then asked Garcia whether he could see the doorjamb VIN sticker when he was

looking into the 2016 Ford Fusion SE's back seat akin to how Lucero had looked into the back

seat to speak with Guerra.  See Tr. at 83:5-8 (Pori, Garcia).  Garcia maintained that he could not

see the doorjamb VIN sticker with his head in that position and at that angle.  See Tr. at 83:9

(Garcia).

The United States then began its cross-examination of Garcia.  See Tr. at 83:15 (Torrez).

The photograph of the doorjamb appeared at first to confuse the United States until Garcia

distinguished the VIN sticker from the door latch and clarified that the sticker does not have

rivets to attach it to the doorjamb.  See Tr. at 83:21-84:19 (Torrez, Garcia).  After ascertaining

Garcia's and the camera's positions when Garcia snapped the VIN sticker photograph, the United States asked Garcia whether it is possible that Garcia could not see the VIN sticker while looking into the back seat, because his eyesight is weaker than Lucero's. See Tr. at 84:20-85:8 (Torrez). Garcia acknowledged that weak eyesight was a contributing factor. See Tr. at 85:9-10 (Garcia). The United States then inquired whether, in Garcia's experience as a patrolman, he had become more perceptive than an average person as regards motorists' nervousness. See Tr. at 85:11-87:21 (Torrez, Garcia). Garcia reported that his perception had become keener on account of that experience. See Tr. at 87:21 (Garcia). Turning its attention to the consent issue, the United States then asked Garcia in closing whether, in all his years performing vehicle and residential searches, he ever doubted that a motorist or tenant consented to a vehicle search when the motorist or tenant provided him with written consent. See Tr. at 88:1-25 (Torrez). Garcia indicated that he never had doubted consent from any person whom he had apprised of his or her right to deny consent for a search. See Tr. at 89:1-3 (Garcia).

In his redirect, Torres first queried Garcia whether he had seen any obvious signs that Torres was nervous when Garcia watched the traffic stop's dashboard camera video. See Tr. at 89:8-9 (Pori). Garcia stated that he had not seen indicia of nervousness such as sweating or shaking, or any other behavior that would have coaxed him into believing that Torres was unnaturally nervous -- caveating that Torres stood outside of the camera's field of view for a large portion of the video See Tr. at 89:11-22 (Pori, Garcia). Torres then inquired whether Garcia had any experience examining vehicles VINs. See Tr. at 89:23-24 (Pori). Garcia indicated that he has such experience, and that his typical protocol for examining a VIN when he was on patrol is to look at the windshield VIN plate and then open the driver's door to look at the doorjamb VIN sticker, from which vantage point he can take a look inside the vehicle. See Tr. at

90:1-91:1 (Garcia). Torres thereupon completed his redirect, and the Court excused Garcia. <u>See</u> Tr. at 91:2-9 (Pori, Torrez, Court).

The parties had no more witnesses, so the Court invited Torres to argue his Motion to Suppress. <u>See</u> Tr. at 91:14-15 (Court). Torres asserted that Lucero had all the information he needed to complete the speeding citation by the time he checked the Ford Fusion's VIN, <u>i.e.</u>, before the first time that he engaged Guerra in conversation. <u>See</u> Tr. at 91:16-92:2 (Pori). According to Torres, the rest of the traffic stop was little more than Lucero's illegal effort to develop probable cause or reasonable suspicion of criminal activity. <u>See</u> Tr. at 92:3-12 (Pori). Torres further contended that he was not free to leave, and that no consent he may have given to a vehicle search can trump or rectify an illegal detention for longer than was required to issue him the speeding ticket -- even if the stop lasted, based on the dashboard camera's timer, only forty seconds longer than it otherwise would have. <u>See</u> Tr. at 92:13-95:25 (Pori). Torres maintained that the allegedly illegal forty-second delay renders moot any debate about Torres' nervousness or the suspiciousness of Torres' and Guerra's travel plans. <u>See</u> Tr. 96:1-14 (Pori). Torres conceded that his argument might seem to be an extreme reading of the law about prolonged detentions, <u>see</u> Tr. at 93:2-12 (Pori), but he argued that the Fourth Amendment is meaningless if a police officer can stop a motorist and then prolong the interaction for any amount of time beyond the time necessary to write a citation, <u>see</u> Tr. at 96:18-98:14 (Pori). The Court indicated that it never had seen or discovered a similar case in which a court had deemed a stop prolonged by only forty seconds to constitute an unconstitutional detention. <u>See</u> Tr. at 98:15-20 (Court). Torres agreed with the Court, but maintained that <u>Rodriguez v. United States</u> speaks plainly about <u>any</u> measurable extension, be it even "a nanosecond." Tr. at 98:21-99:9 (Pori).

The Court sought to ensure that it understood the entire scope of Torres' argument for suppression, asking Torres whether: (i) the forty-second delay was the sole stanchion upon which he was basing his argument; and (ii) Torres was also alleging lack of consent. See Tr. at 99:10-12 (Court). Torres indicated that his argument was more involved than these two arguments; namely, that Lucero extracted Torres' consent while illegally detaining him. See Tr. at 99:13-100:11 (Pori). Furthermore, Torres stated, the encounter between Lucero and Torres was not consensual for two reasons: (i) Lucero's reasonable suspicion of criminal conduct makes consent the wrong standard to apply, see Tr. at 100:14-102:1 (Pori); and (ii) Torres was not free to leave, see Tr. at 102:2-18 (Pori).

The United States then began its short argument why the Court should deny Torres' Motion to Suppress. See Tr. at 102:23 (Torrez). The United States first indicated that Lucero's reasonable suspicion of criminal conduct, because it preceded Torres' consent, does not vitiate Torres' consent to questioning or to a vehicle search. See Tr. at 102:23-103:16 (Torrez). Second, the United States asserted, Lucero spoke with Guerra before he finished processing Torres' citation and handed Torres' paperwork back to him, meaning that Lucero's discussion with Guerra did not prolong the stop. See Tr. at 103:16-104:5 (Torrez). Third, the United States contended, even if the Court concludes that Lucero's discussion with Guerra prolonged the stop by the forty seconds that Torres maintains it prolonged the stop, it would be a misreading of Rodriguez v. United States to conclude that such a short prolongation qualifies as an unconstitutional detention and requires the Court to suppress evidence as Torres requests. See Tr. at 104:5-14 (Torrez).

The parties' arguments having come to an end, the Court shared its initial inclination with the parties. See Tr. at 104:18-105:9 (Court). As the Court indicated at the time,

"I'll take a look at this forty seconds, but I think I wrestled with this issue in [United States v.] Ramos, and I'm inclined to think that I'll not use that as a basis to suppress the evidence[,] but I'll take a look at it. Ginsburg's language is strong, and so I need to deal with it. I guess, again, most of this looks like it was dealt with in Ramos to me[,] and it looks like it . . . had two bases, parts of it at times looked consensual, and parts of it were reasonable suspicion. But I think that it is a fairly short encounter, and the officer was able to get information that led him to believe that there was criminal activity taking place. So I'm inclined to deny the Motion to Suppress . . . ."

Tr. at 104:18-105:6 (Court). The hearing then ended. See Tr. at 106:2 (Court).

## RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)). "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of

Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)). The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

## 1.      Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable. Kentucky v. King, 131 S. Ct. at 1856 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)). "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121 (citing, as an e.g. cite, Terry). The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Samson v. California, 547 U.S.

at 848 (quoting <u>United States v. Knights</u>, 534 U.S. at 118).  <u>See</u> <u>Banks v. United States</u>, 490 F.3d

1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-

circumstances test as one where 'the reasonableness of a search is determined by assessing, on

the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the

degree to which it is needed for the promotion of legitimate governmental interests'" (quoting

<u>United States v. Knights</u>, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

<u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. at 652-53 (1995)(quoting <u>Skinner v. Ry. Labor</u>

<u>Executives' Ass'n</u>, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of

reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

<u>Bell v. Wolfish</u>, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the

Tenth Circuit look to the individual's privacy expectations.  <u>See, e.g.</u>, <u>United States v. Knights</u>,

534 U.S. 112, 119-120 (2001)(noting that the petitioner had a "significantly diminished . . .

reasonable expectation of privacy," because a condition of his probation was to consent to search

of his apartment without notice or probable cause, and because he was clearly notified and

informed of the provision); <u>Banks v. United States</u>, 490 F.3d at 1186-87 (noting that the

plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions." Florida v. Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)). Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." 515 U.S. at 654 (internal citations omitted).

2.    **Traffic Stops.**

A traffic stop is an investigative detention, see United States v. Toro-Pelaez, 107 F.3d 819, 823 (10th Cir. 1997), and is thus analyzed according to the principles that the Supreme Court set forth in Terry, see United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir. 2011)(concluding that a traffic stop is a Terry stop); United States v. Leon-Quijada, 107 F.3d 786, 792 (10th Cir. 1997). In Terry, the Supreme Court authorized police officers to conduct

limited seizures and to search a person's outer clothing when the officer has reasonable suspicion that criminal activity may be afoot.  See Terry, 392 U.S. at 30-31.  The Tenth Circuit has concluded that traffic stops fall into the category of Terry stops.  See United States v. Toro-Pelaez, 107 F.3d at 823-24 ("A traffic stop is a seizure within the meaning of the Fourth Amendment[, but] it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause."); United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *10 (D.N.M. Feb. 19, 2010)(Browning, J.); United States v. Hanrahan, No. CR 04-1978 JB, 2005 WL 2312746, at *4 (D.N.M. Aug. 12, 2005)(Browning, J.), aff'd, 508 F.3d 962 (10th Cir. 2007).

For officers to lawfully stop a vehicle, they must have "a particularized and objective basis for suspecting the particular persons stopped of criminal activity."  United States v. Leos–Quijada, 107 F.3d at 792 (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Police officers may stop a vehicle only when they have "a reasonable, articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity."  United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995)(citing United States v. Nicholson, 983 F.2d 983, 987 (10th Cir. 1993)).  Accord United States v. Ramos, 194 F. Supp. 3d at 1156.  Reasonable suspicion is not determined by any one factor, but by the totality of the circumstances that the officer knew.  See United States v. Ceballos, 2009 WL 4642368, at *2-3 (10th Cir. 2009)(unpublished); United State v. Elkins, 70 F.3d at 83 (citing Alabama v. White, 496 U.S. 325, 330 (1990)).  Even if the officer does not form subjective reasonable suspicion, if the circumstances of which he is aware would lead an officer to develop reasonable suspicion, the stop is proper.  See United States v.

Ceballos, 2009 WL 4642368, at *2 (holding that an officer's "subjective characterization of his actions is irrelevant").

If a police officer observes a traffic violation, the officer has cause to execute a traffic stop. See Whren v. United States, 517 U.S. 806, 809-10 (1996)("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); United States v. Ramstad, 308 F.3d 1139, 1144 & n. 1 (10th Cir. 2002)(acknowledging that Whren v. United States "indicate[s] that probable cause is a *sufficient* ground for a stop," but explaining that reasonable suspicion is all that is necessary) (quoting United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001)). Even if the officer has an ulterior motive for executing the traffic stop -- i.e., to investigate some other suspected illegal conduct -- the officer can lawfully stop a vehicle that he or she observes violating the traffic laws. See Whren v. United States, 517 U.S. at 813-14; United States v. King, 209 F. App'x 760, 762 (10th Cir. 2006)("The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved.")(citing Whren v. United States, 517 U.S. at 813). In other words, there is no constitutional prohibition on what are colloquially referred to as "pretext stops," so long as the officer also has a constitutional basis for executing the stop. United States v. Sedillo, 2010 WL 965743, at *10.

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 135 S. Ct. 1609 (2015). See Knowles v. Iowa, 525 U.S. 113, 117 (1998)(observing that the investigation into the traffic offense is "a relatively brief encounter" that is "more analogous to a so-called '*Terry* stop' . . . than to a formal arrest")(quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984)). The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' -- to address the traffic violation

that warranted the stop, . . . and attend to related safety concerns." Rodriguez v. United States, 135 S. Ct. at 1614. Because the officer's purpose is to address the traffic infraction, the stop may last no longer than is necessary to effectuate that purpose. See Illinois v. Caballes, 543 U.S. 405, 407 (2005). The authority for the seizure therefore ends when the officer completes -- "or reasonably should have [] completed" -- the tasks tied to the traffic infraction. Rodriguez v. United States, 135 S. Ct. at 1614. See United States v. Hunnicutt, 135 F.3d 1345 (10th Cir. 1998)(observing that the traffic stop must last no longer than necessary to confirm or deny the suspicion that justified the stop -- the traffic offense); United States v. Ramos, 194 F. Supp. 3d at 1157. In short, absent reasonable suspicion to justify an extended detention, an officer cannot "measurably extend" the stop beyond the time reasonably necessary to complete his traffic-related inquiries. Rodriguez v. United States, 135 S. Ct. at 1615.

Beyond writing the traffic citation, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." Illinois v. Caballes, 543 U.S. at 408. Typically, these inquiries involve checking the driver's license, registration, and proof of insurance, as well as determining whether any outstanding warrants for the driver exist. See Delaware v. Prouse, 440 U.S. 648, 658-60 (1979). These checks serve the same purpose as the traffic code: to ensure that vehicles on the road are operated safely and responsibly. See Delaware v. Prouse, 440 U.S. at 658-59; 4 W. LaFave, Search and Seizure § 9.3(c), 507-517 (5th ed. 2012). Similarly, a VIN inspection confirms that the driver can legally operate this particular vehicle -- because it is not stolen -- on the highway. See New York v. Class, 457 U.S. 106, 115 (1986)(concluding that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop"). The Supreme Court has held VIN searches "constitutionally permissible in light of the lack of a reasonable expectation of privacy in the

VIN and the fact that the officer's observed respondent commit two traffic violations." New York v. Class, 457 U.S. at 119. See id. at 114 ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile."). Unlike license and insurance, however, checking the VIN located inside of the vehicle's doorjamb requires opening the vehicle's door. Nonetheless, the Supreme Court has stated that neither of the VIN's two locations -- "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile" -- is subject to a reasonable expectation of privacy." New York v. Class, 475 U.S. at 118. Checking a vehicle's VIN therefore has a similarly close connection to roadway safety as the ordinary inquiries, so it can fairly be characterized as part of the officer's traffic mission.

Officers may also engage in routine questioning while conducting the traffic stop, but "only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" Rodriguez v. United States, 135 S. Ct. at 1614 (quoting Arizona v. Johnson, 555 U.S. 323, 327-28 (2009)). See Muehler v. Mena, 544 U.S. 93, 101 (2005)(noting that, because unrelated inquiries did not "exten[d] the time [the petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was required"). Accordingly, an officer may conduct certain unrelated checks during a lawful traffic stop, but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez v. United States, 135 S. Ct. at 1615.

In Rodriguez v. United States, the Supreme Court held that a "seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." 135 S. Ct. at 1612 (alterations in original)(internal quotation marks omitted). There, a police officer

issued a driver a traffic warning, and returned to the driver and to the passenger all of their documents.  See 135 S. Ct. at 1613.  After "the justification for the traffic stop was 'out of the way,'" the officer, without permission from the driver: (i) instructed the driver to turn off the ignition, exit the vehicle, and stand by the patrol car; and (ii) deployed a K-9 to circle the vehicle twice to sniff for drugs.  135 S. Ct. at 1613.  "[S]even or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs."  135 S. Ct. at 1613.  The Supreme Court rejected the United States Court of Appeals for the Eighth Circuit's conclusion that the seven- or eight-minute delay constituted an acceptable "*de minimis* intrusion on Rodriguez's personal liberty."  135 S. Ct. at 1614.  The Supreme Court concluded that the dog sniff, if performed without reasonable suspicion, measurably extended the detention and noted that the officer's authority to detain the driver "end[ed] when tasks tied to the traffic infraction are -- or reasonably should have been -- completed."  Rodriguez v. United States, 135 S. Ct. at 1614.  See United States v. Sharpe, 470 U.S. 675, 686 (1985)(stating that, in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation")(alterations added).

    **3.**    **Vehicle Searches.**

While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro–Pelaez, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search.").  Under the automobile-exception to the warrant requirement,

however, a warrant is generally not required.  See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999); United States v. Burgess, 576 F.3d 1078, 1087 (10th Cir. 2009)(citing California v. Acevedo, 500 U.S. 565, 580 (1991)).  The ongoing exigent circumstance that the vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle.  See Maryland v. Dyson, 527 U.S. at 466-67 ("[W]here there [is] probable cause to search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.")(citing United States v. Ross, 456 U.S. 798, 809 (1982))(internal quotes omitted); California v. Carney, 471 U.S. 386, 393-94 (1985).  Thus, as long as the investigating officer has probable cause to believe that the vehicle contains contraband or evidence of criminality, he or she may search the vehicle without a search warrant.  See United States v. Sedillo, 2010 WL 965743, at *11.

**4.      Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government (i) "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances. See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources). Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer." United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original). See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010). The inquiry is an objective one. See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003). "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances. For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search,

the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words.  "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal.  Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d at 789-90.  See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'").  For example, in United States v. Ringold, 335 F.3d 1168 (10th Cir. 2003), the Tenth Circuit held that an affirmative nod was sufficient to constitute consent.  See 335 F.3d at 1175.

In United States v. Gordon, the suspect moved to suppress all physical evidence an officer seized from a locked duffle bag.  See 173 F.3d at 765.  The officer then asked to see the suspect-train passenger's ticket and identification, inquired into his travel plans, and asked if he had any luggage.  See 173 F.3d at 765.  The officer did not inform the suspect that he was free to leave or not answer her questions.  See 173 F.3d at 765.  The officer asked to search the suspect's luggage and the suspect gave his consent.  See 173 F.3d at 765.  She asked him whether he had any contraband, informing him that contraband was the subject of her search.  See 173 F.3d at 765.  When she encountered the suspect's locked bag, she asked him if he could open it.  See 173 F.3d at 765.  Although the suspect did not respond verbally, he "removed the key from his pocket and handed it to [the officer]."  173 F.3d at 766.  The Tenth Circuit concluded that the suspect's "voluntary relinquishment of the key evidenced his consent to search the locked duffle bag."  173 F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his luggage.  See 173 F.3d at 766.  The ultimate issue in determining the scope of consent is what a reasonable person would have understood the suspect's consent to include.  See United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995).  The Tenth Circuit determines whether a search remains within the boundaries of the consent given based on the totality of the circumstances.  See United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996).  When an officer tells a suspect the object of his search and the suspect consents to a search for that object within a certain area, the Tenth Circuit has "consistently and repeatedly" held that the suspect thereby consents to a search of any area within the confines of the officer's request where the object may be found.  United States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search

for drugs, he consented to a search of any area in the motel room where one might hide drugs").

See United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that search did not exceed the scope of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in searching the entire vehicle"); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding that the removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed the scope of consent to search the car); United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the defendant consented to a search of his apartment for another person, he consented to the search of any area large enough to accommodate that individual).

Notably, if the suspect fails to object to the officer's search, it indicates that "the search was within the scope of consent."  United States v. Gordon, 173 F.3d at 766.  See United States v. Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics).  Accordingly, in United States v. Gordon, the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked bag when the officer discovered it within his larger bags.  173 F.3d at 766 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")).  The Tenth Circuit emphasized: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."  173 F.3d at 766.

## RELEVANT LAW REGARDING THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the government will generally be prohibited from using that evidence in a criminal prosecution of that person. See Sanchez–Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process.")(internal citations omitted); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment and a causal nexus between the violation and the evidence sought to be excluded. See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir.2006). Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies. See United States v. Torres-Castro, 470 F.3d at 999. The Supreme Court has recognized several exceptions to the exclusionary rule. See United States v. Alabi, 943 F. Supp. 2d 1201, 1255 (D.N.M. 2013), aff'd, 597 F. App'x 991 (10th Cir. 2015).

One such exception is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful

act and the discovery of evidence." Utah v. Strieff, 136 S. Ct. at 2061. To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence, courts examine the three factors that the Supreme Court articulated in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Brown v. Illinois, 422 U.S. at 603. This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained. Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam). The Supreme Court has previously concluded that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval, and, therefore, counseled in favor of suppressing the evidence. Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances." Brown v. Illinois, 422 U.S. at 603-04. The Supreme Court found sufficient intervening circumstances to admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applied the independent source doctrine. See 468 U.S. at 799-801, 814. There, agents had probable cause to believe that apartment occupants were dealing cocaine. See 468 U.S. at 799-800. They sought a warrant. See 468 U.S. at 799-800. In the meantime, they entered the apartment, arrested the occupant, and discovered evidence of drug activity during their security sweep. See 468 U.S. at 800-01. The next evening, they obtained a search warrant. See 468 U.S. at 800-01. The Supreme Court deemed the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant was "wholly unconnected with the entry and was known to the agents well before the initial entry." 468 U.S. at 814. The Supreme Court suggested that

"the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'" Utah v. Strieff, No. 14-1373, slip op. at 5, 2016 WL 3369419, at *6-7 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. at 604. See Utah v. Strieff, No. 14-1373, slip op. at 6, 2016 WL 3369419, at *5 (observing that the third factor is particularly significant). The exclusionary rule exists to deter police misconduct. See Davis v. United States, 564 U.S. 229, 236-37 (2011). The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant." Utah v. Strieff, No. 14-1373, slip op. at 8, 2016 WL 3369419, at *7. Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation." Utah v. Strieff, No. 14-1373, slip op. at 8, 2016 WL 3369419, at *7.

## ANALYSIS

Lucero did not unconstitutionally extend the traffic stop when he questioned Torres and Guerra. After the traffic stop ended, Torres voluntarily consented to answer further questions. Although this questioning evolved into a lawful detention that reasonable suspicion supported, Torres and Guerra nonetheless freely and voluntarily consented to a vehicle search during the detention. Accordingly, Torres' vehicle search was lawful. The Court consequently denies the requests in Torres' Motion to Suppress and will not suppress the evidence of the methamphetamine that Lucero discovered in the Ford Fusion SE's trunk.

# I.    LUCERO'S QUESTIONING OF GUERRA DID NOT UNCONSTITUTIONALLY EXTEND THE TRAFFIC STOP.

The Court first concludes that the traffic stop began lawfully.  Torres admits that he was speeding on Interstate 40 when Lucero pulled him over for exceeding the posted maximum speed limit.  See Motion to Suppress ¶ 2, at 2; Reply at 2.  If a police officer observes a traffic violation, the officer has cause to execute a traffic stop.  See Whren v. United States, 517 U.S. at 809-10 ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); United States v. Ramstad, 308 F.3d at 1144 & n.1 (acknowledging that Whren v. United States "indicate[s] that probable cause is a *sufficient* ground for a stop," but explaining that reasonable suspicion is all that is necessary)(quoting United States v. Callarman, 273 F.3d at 1286)).  Even if Lucero had an alternative motive for making the stop -- a hypothetical scenario for which the Court finds no support in this case's facts and a theory that Torres does not assert -- Lucero was within his legal authority to pull over the Ford Fusion SE when he saw its motorist violating a traffic law.  See Whren v. United States, 517 U.S. at 813-14; United States v. King, 209 F. App'x 760, 762 (10th Cir. 2006)("The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved.").  In other words, there is no constitutional prohibition on what some colloquially refer to as "pretextual stops," so long as the officer also has a constitutional basis for executing the stop.  United States v. Sedillo, 2010 WL 965743, at *10.

To have remained lawful under Terry, the stop must have lasted no longer than necessary to confirm or deny the suspicion that justified the stop.  See United States v. Hunnicutt, 135 F.3d at 1349.  Absent reasonable suspicion to justify an extended detention, Lucero could not "measurably extend" the traffic stop beyond the time he reasonably needed to complete inquiries related to the speeding infraction.  Rodriguez v. United States, 135 S. Ct. at 1615.  Torres argues,

however, that Lucero violated the Fourth Amendment when he allegedly unnecessarily extended the traffic stop by engaging in a prolonged conversation with Guerra. See Motion to Suppress at 8-13.

The Court begins its analysis with the uncontroversial stance that Lucero was authorized to ask routine questions while performing other tasks related to the traffic stop. See Arizona v. Johnson, 555 U.S. at 333; Muehler v. Mena, 544 U.S. at 101 (stating that the Supreme Court has "held repeatedly that mere police questioning does not constitute a seizure"); United States v. Wilson, 96 F. App'x 640, 644 (10th Cir. 2004)(explaining that "a police officer may, during a routine traffic stop, 'ask about the driver's authority to operate the vehicle,' check the driver's license and registration, and ask about travel plans" (quoting United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001)(en banc)). Lucero could have violated Torres' Fourth Amendment rights only if Lucero measurably extended the traffic stop detention by asking questions unrelated to the traffic stop's objective. See Rodriguez v. United States, 135 S. Ct. at 1615 (noting that an officer may not conduct unrelated inquiries "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual").

During the traffic stop that Torres challenges, the questions that Lucero asked Torres and Guerra related to Torres' and Guerra's travel. See Traffic Stop DVD at 3:43-7:01, 11:27-21:04 In 2000, in United States v. West, the Tenth Circuit, in an opinion that Senior Judge Frank Magill,[9] sitting by designation, wrote, and Judges Ebel and Porfilio joined, held that questions about travel plans are routine during a traffic stop, and that a patrol officer therefore may ask the

---

[9]Senior Judge Frank J. Magill was a United States Circuit Judge commissioned to a seat on the Eighth Circuit. See Federal Judicial Center, Biographical Directory of Article III Federal Judges: Frank J. Magill, https://www.fjc.gov/history/judges/magill-frank-j. (last visited June 7, 2017).

motorist whom he or she stopped about the motorist's travel plans without exceeding the proper

scope of a traffic stop. See United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000)(quoting

United States v. Hernandez, 93 F.3d at 1498).[10]  The Tenth Circuit has confirmed this position

---

[10]A tension exists between some of Tenth Circuit cases and earlier Supreme Court cases -- which are fairly lenient toward law enforcement personnel with regards to expanding a traffic violation's scope -- and Justice Ginsburg's statement in Rodriguez v. United States that a traffic stop "may last no longer than is necessary to effectuate th[e stop's] purpose."  135 S. Ct. at 1614. Justice Ginsburg's statement is rooted in prior cases such as Florida v. Royer, 460 U.S. at 500, and Illinois v. Cabelles, 543 U.S. at 407.  Nevertheless, Justice Ginsburg may be signaling a new and more restrictive direction in traffic stops.  Although the Supreme Court and the Tenth Circuit have held that: (i) a police officer can detain a motorist only as long as necessary to complete the tasks that justified the stop; and (ii) as a general principle, a Terry stop cannot exceed the stop's reason's scope, see Rodriguez v. United States, 135 S. Ct. at 1614, the Supreme Court and the Tenth Circuit over the years incrementally have added permissible tasks within the stop context. The resulting tension arises from the fact that, on the one hand, officers must take no more time than necessary to perform tasks related to the stop, but that, on the other hand, the tasks related to the stop are innumerable.  In effect, the rule of "no longer than [] necessary" has transformed from brutalist to rococo: a strong, unadorned statement embellished and filigreed to the point that it almost has become unrecognizable.  See Rodriguez v. United States, 135 S. Ct. at 1614.
    For instance, if a patrol officer stops a motorist for speeding, it is unclear why the patrol officer can ask to see the motorist's registration or insurance card.  If the patrol officer only has probable cause to investigate the speeding infraction, the patrol officer must, when he or she examines registration and insurance, be investigating whether the motorist violated any other traffic code provisions, such as those that require a motorist to have a valid driver's license and automobile insurance.  The same can be said for VIN inspections.  If a patrol officer pulls a motorist over for speeding, the VIN -- a static number -- provides no information related to the vehicle's speed.  The only reason a patrol officer would examine a VIN is to detect whether the vehicle is stolen.  Whether a patrol officer checks a motorist's license and registration, or rubbernecks inside the driver's door to check the doorjamb VIN sticker, these actions take time and are unrelated to the investigation whether the motorist violated speeding maximum vehicular speed laws.  Nevertheless, Rodriguez v. United States does not find that such actions extend the traffic stop longer than is necessary.  See Rodriguez v. United States, 135 S. Ct. at 1613.  In effect, Justice Ginsburg's limiting language in Rodriguez v. United States is much less severe than Torres' decontextualized reading of it suggests.
    The Tenth Circuit has wrestled with the tension internal to Rodriguez v. United States multiple times in an attempt to pin down what precisely constitutes an unconstitutional extension of a traffic stop.  See, e.g., United States v. Williams, 271 F.3d 1262 (10th Cir. 2001); United States v. Holt, 229 F.3d 931 (10th Cir. 2000).  In an opinion that later was vacated on rehearing en banc, the Tenth Circuit, in a decision that Judge Briscoe wrote and Judge McKay joined -- but from which Judge Ebel dissented -- questioned whether inquiries about a driver's travel plans relate to a stop's purpose.  See United States v. Holt, 229 F.3d at 936.  The Tenth Circuit stated in its decision that "none of the [Tenth Circuit's previous] decisions explore or explain why it is

constitutionally permissible for an officer to ask [a] detainee about his or her travel plans if the questioning is unrelated to the purpose of the stop." United States v. Holt, 229 F.3d at 936 (citing United States v. Kopp, 45 F.3d 1450, 1454 (10th Cir. 1995)(acknowledging that officer asked detainee questions about his travel plans); United States v. McSwain, 29 F.3d 558, 561 (10th Cir. 1994)(stating that "an officer conducting a routine traffic stop may inquire about 'identity and travel plans'"); United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989)(holding that it was permissible for an officer to "ask questions relating to . . . identity and travel plans")). The Tenth Circuit nevertheless distinguished its former decisions allowing travel-related questions and the case at issue, where the officer questioned whether the motorist's vehicle contained loaded weapons, and the Tenth Circuit appears to have segregated travel-related questions in a different category. See 229 F.3d at 936. After a rehearing en banc, the Tenth Circuit vacated the decision. See United States v. Holt, 264 F.3d 1215, 1217-18 (10th Cir. 2001)(en banc), vacating 229 F.3d 931 ("Holt II").

In later describing Holt II, the Tenth Circuit reaffirmed its prior notion that travel-related questions are within a traffic stop's scope. It therewith contradicted Holt I's assertion that the Tenth Circuit had not directly addressed the issue, stating:

> When directly confronted with the issue, we have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop. *See West*, 219 F.3d at 1176 (stating that "questions about travel plans are routine and 'may be asked as a matter of course without exceeding the proper scope of a traffic stop'")(quoting *United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir. 1996)); *see also United States v. Santana-Garcia*, 264 F.3d 1188, 1192-93 (10th Cir. 2001)(quoting *West*, 219 F.3d at 1176); *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989); *United States v. Hill*, 195 F.3d 258, 268 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 . . . (2000); *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 . . . (2000). Though such questions do typically fall within the scope of a traffic stop, citizens' legitimate privacy interests are protected in that they are not legally obligated to answer such questions, nor can an officer compel an answer to these routine questions. *See United States v. $404,905.00*, 182 F.3d at 647 n.2 (citing *Terry* [v. United States], 392 U.S. at 34, 88 S. Ct. 1868 (White, J., concurring)). In addition, a motorist's refusal to answer routine questions may not furnish a basis for arrest, "although it may alert the officer to the need for continued observation." *Terry* [v. United States], 392 U.S. at 34, 88 S. Ct. 1868 (White, J., concurring).

United States v. Williams, 271 F.3d at 1267 (emphasis added). After clarifying that travel-related questions are within a traffic stop's scope, the Tenth Circuit concluded that "the officer's questioning regarding [the motorist's] travel plans was within the scope of the traffic stop." 271 F.3d at 1267.

The Court is of the opinion that many of the tasks that the Supreme Court and the Tenth Circuit allow are inconsistent with the Constitution of the United States and that the federal courts should be cautious about allowing too many unnecessary tasks. The Court suggests that officers should take no longer than necessary to investigate the particular reason for a given

repeatedly in the seventeen years since United States v. West.  In 2006, in United States v. Briseno, 163 Fed. App'x 658 (10th Cir. 2006), in an opinion that Judge Murphy wrote, and Judges Ebel and McConnell joined, the Tenth Circuit stated that "it is well established in this Circuit that an officer conducting a routine traffic stop may inquire about identity and travel plans . . . ."  163 F. App'x at 664.  In 2007, in United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007), in an opinion that Judge McConnell wrote, and Judges Henry and Holloway joined, the Tenth Circuit again concluded that "the content of police questions during a lawful detention does not implicate the Fourth Amendment as long as those questions do not prolong the detention."  473 F.3d at 1269.  In 2010, in United States v. Simpson, 609 F.3d 1140 (10th Cir. 2010), an opinion that Judge Henry wrote, and Judges Murphy and O'Brien joined, the Tenth

---

traffic stop unless: (i) the patrol officer has reasonable suspicion or probable cause to investigate other crimes; or (ii) the motorist gives consent.  The Court would be hard-pressed to conclude that a patrol officer routinely should be permitted to check a motorist's registration and insurance, inspect a stopped vehicle's VIN, or barrage a motorist with travel-related questions after writing a ticket or handing back papers, without reasonable suspicion or consent.

At the oral argument for Rodriguez v. United States, the Honorable Antonin Scalia, then-Associate Justice of the Supreme Court, also questioned why checking a driver's license, asking travel-related questions, and determining whether a car is stolen "are embraced within the mission [of a traffic stop for a broken taillight] when the only basis for the stop is you have a broken taillight."  Transcript of Oral Argument at 9, Rodriguez v. United States, 135 S. Ct. 1609 (2015)(No. 13-9972)("Rodriguez Tr."); id. at 10 ("It's a broken taillight.  That's the only thing that comes within the traffic stop.  All the rest is added on.").  The Honorable Samuel Alito, Associate Justice of the Supreme Court, similarly asked why "adding any time to the stop in order to do a records check is part of the mission but the dog sniff is not."  Rodriguez Tr. at 21.  Justice Scalia concluded that courts are "willing to expand the mission to everything up to but not beyond the dog sniff."  Rodriguez Tr. at 10.

The Court shares Justice Scalia's and Justice Alito's skepticism toward the current state of the law on this issue, convinced that the police should accomplish the narrow task set related to the stop and let the driver go, rather than use a traffic stop to investigate for more crimes, unless there is reasonable suspicion or consent.  The Court is, however, a district court, and Supreme Court and Tenth Circuit precedent bind it.  Even if the Court thinks and hopes that Justice Ginsburg's statement that a stop "may last no longer than is necessary to effectuate th[e stop's] purpose," 135 S. Ct. at 1614, signals the direction that the Supreme Court will go, the Court as a district court cannot ignore Supreme Court and Tenth Circuit cases.

Circuit indicated: "Even in the absence of reasonable suspicion an officer may ask questions, whether or not related to the purpose of a traffic stop, if they do not excessively prolong the stop." 609 F.3d at 1146 n.1 (citing Wilson v. Sirmons, 536 F.3d 1064 (10th Cir. 2008)). In 2014, in United States v. $85,688.00 in U.S. Currency, 577 F. App'x. 811 (10th Cir. 2014), in a per curiam opinion to which Judge Ebel filed a separate concurring opinion, the Tenth Circuit took an even more expansive position, concluding that it was reasonable for a patrol officer to "inquire about [the defendant's] travel plans . . . and almost anything else, whether or not related to the purpose of [the] traffic stop, so long as the questions d[id] not excessively prolong the stop." 577 F. App'x at 814 (second set of brackets in original)(internal quotation marks and citation omitted). In 2015, in United States v. Moore, 795 F.3d 1224 (10th Cir. 2015), in an opinion that Judge Briscoe wrote and which then-Judge and now Chief Judge Tymkovich and Judge Moritz joined, the Tenth Circuit again concluded that a patrol officer "may also generally inquire about the driver's travel plans, and ask questions, whether or not related to the purpose of the stop, so long as they do not prolong the stop." 795 F.3d at 1229. Just a few months ago, in United States v. Hernandez, 847 F.3d 1257 (10th Cir. 2017), in an opinion that Judge Seymour wrote, and Judges Seymour and Lucero joined, the Tenth Circuit reaffirmed the broader principle that officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals in public places and putting questions to them if they are willing to listen. See 847 F.3d at 1272.

At the same time, the Tenth Circuit has drawn no line in the hourglass' sand to indicate how long a patrol officer may lawfully question a motorist about the motorist's travel plans without exceeding the traffic stop's scope. Once the questioning becomes an unrelated task, it is subject to Rodriguez' requirement that the task not prolong the detention. Relying on United

States v. Hunnicutt, Torres asserts that a traffic stop may "last no longer than in necessary to effectuate the purpose" of the stop, i.e., in this case the writing of a speeding ticket. Motion to Suppress at 8 (quoting United States v. Hunnicutt, 135 F.3d at 1349). At the hearing, Torres entrenched himself in what he concedes may seem to be an extreme reading of the law regarding prolonged detentions by construing Ginsburg's words to mean that even "a nanosecond" -- let alone forty seconds -- of questioning after Lucero read the Ford Fusion SE's doorjamb VIN sticker violates the Fourth Amendment. Tr. at 98:21-99:9 (Pori).

The Court noted at the motion hearing that Justice Ginsburg used strong language when she wrote on the Supreme Court's behalf that a patrol officer may not "measurably extend the duration of the stop" beyond the time reasonably required to complete writing a ticket. Rodriguez v. United States, 135 S. Ct. at 1617. See Tr. at 104:18-105:9 (Court)("Ginsburg's language is strong, and so I need to deal with it."). After reviewing Rodriguez v. United States, the Court notes that the question before the Supreme Court in that case was "whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." Rodriguez v. United States, 135 S. Ct. at 1614. In other words, the Supreme Court considered a question different in at least one significant respect from that at issue in this case, in which Lucero never deployed a K-9 unit to sniff the Ford Fusion SE. The Court nevertheless concludes that Rodriguez v. United States applies to all traffic stops even when no canine sniff is involved insofar as the Supreme Court held that the "tolerable duration of police inquiries," i.e., not simply canine sniffs. See 135 S. Ct. at 1614. Justice Ginsburg cites with approval in Rodriguez v. United States an earlier case that the Supreme Court unanimously decided -- Arizona v. Johnson -- explicitly indicating that Arizona v. Johnson correctly held that questions that a patrol officer asks which are not directly related to the infraction that occasioned

a traffic stop do not unreasonably extend a roadside detention.  See Arizona v. United States, 555 U.S. at 327-28.

In Rodriguez v. United States, the Supreme Court majority -- over the minority's vigorous dissent[11] -- held that a seven or eight-minute delay after the end of a traffic stop was a violation of the Fourth Amendment.  See 135 S. Ct. at 1610.  Torres contends that Rodriguez v. United States, by its language's plain meaning, requires the Court to deem "any" delay unconstitutional, even if the delay lasts so long as a "nanosecond."  Tr. at 99:1-9 (Pori).  The Court disagrees.[12]  The plain meaning canon of construction applies to statutes, not to judicial opinions, and the Fourth Amendment does not contain any time benchmarks or thresholds in its text.  See U.S. Const., amend. IV.  Even if the plain meaning canon did apply to judicial opinions, the absurdity exception would rule out Torres' interpretation of "any."  At the time that the Fourth Amendment was ratified in 1791, commercial clocks could not even reliably measure

_____

[11]Justices Kennedy, Thomas, and Alito each filed a separate dissent.  See Rodriguez v. United States, 135 S. Ct. 1609, 1617 (Kennedy, J.)(dissenting); Rodriguez v. United States, 135 S. Ct. 1609, 1617-23 (Thomas, J.)(dissenting); Rodriguez v. United States, 135 S. Ct. 1609, 1623-25 (Alito, J.)(dissenting).  Justice Kennedy joined in the first two parts of Justice Thomas' dissent, in which Justice Thomas indicated that a twenty-nine minute delay during a traffic stop "is hardly out of the ordinary for a traffic stop by a single officer of a vehicle containing multiple occupants even when no dog sniff if involved."  See 135 S. Ct. at 1618 (Thomas, J.)(dissenting).  After criticizing the majority's opinion as "unnecessary, impractical, and arbitrary," and later as "perverse," 135 S. Ct. at 1623-24 (Alito, J.)(dissenting), Justice Alito indicated that a twenty-nine-minute delay does prolong a stop but does so reasonably and, therefore, is not a Fourth Amendment violation, see 135 S. Ct. at 1624-25 (Alito, J.)(dissenting).

[12]As the Court indicated earlier, the Court is extremely sympathetic to Justice Ginsburg's position, and agrees that the police and the courts should strive to minimize the length of any stop.  As the Court has pointed out, however, while the Supreme Court and the Tenth Circuit in one breath have barred delay more than necessary, they have allowed police to investigate other crimes during a VIN number check which have nothing to do with the traffic stop.  The Court has explained that it agrees with Justice Ginsburg's statement, but that it -- as a district court -- cannot ignore Supreme Court and Tenth Circuit cases.

time in seconds, let alone nanoseconds.[13]  Even today, it would be impossible to determine whether a stop has extended an infinitesimal amount of time beyond the time that was necessary to complete a speeding citation.  Dashboard camera footage typically records footage at thirty frames per second, and the fastest commercially produced camera can only record watchable video at approximately seventy thousand frames per second.  See Phantom v2512: Specifications, https://www.phantomhighspeed.com/products/ultrahigh-speed-cameras/v2512 (last visited June 7, 2017).[14]  In short, the Court can find no plausible basis for interpreting Rodriguez to mean that a traffic stop becomes an unconstitutional detention if a patrol officer detains a motorist for, literally, "any" time, Tr. 99:3 (Pori), "any nanosecond measurable," Tr. 99:1-2 (Pori), after the patrol officer has acquired all the information he or she requires to complete writing up the traffic citation that justified the stop.

Although Lucero's questioning of Torres did not violate the Fourth Amendment by unconstitutionally prolonging the traffic stop, Lucero's questioning of Guerra also was extensive. Nevertheless, an officer may ask questions, regardless whether they are related to a traffic stop's purpose, provided that the questions do not excessively prolong the stop.  See United States v. Kitchell, 653 F.3d 1206, 1217 (10th Cir. 2011).  Furthermore, Tenth Circuit precedent explicitly and repeatedly affirms an officer's right to question both the driver and any passenger as part of

---

[13]Even the minute hand was a fairly recent invention, only making its way onto clock towers at the end of the seventeenth century and not becoming commonplace on pocket watches until early in the eighteenth century.  See Gordon Campbell, 1 The Grove Encyclopedia of Decorative Arts 247-55 (chronicling changes to clock and watch faces in the seventeenth and eighteenth centuries).

[14]The Phantom v2512 records at a frame rate of 69,900 frames per second at a resolution of 640x480 pixels -- slightly lower resolution than a standard definition DVD.  Compare Phantom v2512: Specifications, https://www.phantomhighspeed.com/products/ultrahigh-speed-cameras/v2512 (last visited June 8, 2017), with Ralph LaBarge, DVD Authoring and Production 16 (2001).

a routine traffic stop.  See United States v. Jackson, 235 F. App'x 707, 710 (10th Cir. 2007)("The Supreme Court has never questioned an officer's right to interrogate vehicle passengers during a valid *Terry* stop.").  Indeed, the Supreme Court has held that an officer may do more than converse with a passenger during a stop; he or she may order the passenger from the vehicle.  See Maryland v. Wilson, 519 U.S. 409, 414-15 (1997).  Consequently, as the Tenth Circuit previously has observed in a different case with similar circumstances, Lucero did not convert a legitimate traffic stop into an unconstitutional detention by asking Guerra about her travel plans.  See United States v. Jackson, 235 F. App'x at 710.

While Lucero was inspecting the Ford Fusion SE's VIN, he asked Guerra a number of questions about her and Torres' travel plans.  See Traffic Stop DVD at 6:19-7:02.  In his testimony, Lucero stated that it would take him at most a few seconds to compare the last four digits of the windshield VIN plate and the doorjamb VIN sticker against the last four numbers of the VIN as the Ford Fusion SE's registration lists them and to check whether the VIN plate's rivets or the doorjamb sticker showed any evidence of tampering.  See Tr. at 12:3-16 (Lucero). The dashboard camera footage shows that the entire VIN check-cum-conversation with Guerra took approximately forty seconds.  See Traffic Stop DVD at 6:17-7:02.  Torres correctly argues, therefore, that the questioning extended the stop.  Nevertheless, the extended time on account of the questioning did not unconstitutionally extend the traffic stop's duration, because Lucero developed reasonable suspicion to continue questioning Guerra when he noticed that Torres' and Guerra's travel accounts differed in multiple significant respects.  See Arizona v. Johnson, 555 U.S. at 333 (stating that an officer's inquiries into matters unrelated to a traffic stop's justification do not convert those inquiries into something other than a lawful seizure so long as those inquiries do not measurably extend the stop's duration).  Even if each discrepancy might

have had innocent explanation by itself, the Supreme Court has made clear that acts that might be innocent by themselves can give rise reasonable suspicion when taken together. See <u>United States v. Arvizu</u>, 534 U.S. at 274-75.

Lucero developed reasonable suspicion as he was performing tasks related to the traffic stop: (i) writing Torres' speeding citation; (ii) checking the VIN; and (iii) taking safety precautions by interacting briefly with a passenger in the Ford Fusion SE's back seat who at first had been occluded from his sight and by taking the opportunity that a doorjamb VIN check provided to quickly survey the vehicle's interior for dangers. Where such reasonable suspicion exists, "nothing in *Rodriguez* limits [an officer's] ability to reasonably prolong the stop to conduct an investigation of criminal activity." <u>United States v. Santillan</u>, 2015 WL 6115865, at *1 (citing <u>Rodriguez v. United States</u>, 135 S. Ct. at 1615). Because Lucero developed reasonable suspicion while performing tasks related to the traffic stop, the questioning did not measurably extend the detention. Lucero therefore did not violate Torres' or Guerra's Fourth Amendment rights.

## II. TORRES CONSENTED TO ADDITIONAL QUESTIONING AFTER THE TRAFFIC STOP HAD ENDED.

Lucero handed Torres back his papers and identification five minutes after stopping the Ford Fusion SE, <u>see</u> Traffic Stop DVD at 7:08, and he informed Torres that he was free to go nine minutes after initiating the stop, <u>see</u> Traffic Stop DVD at 11:13 ("Alright, you're free to go.")[15] Seven seconds after telling Torres that he was free to go, while Torres was returning to the Ford Fusion SE, Lucero called out Torres' name. <u>See</u> Traffic Stop DVD at 11:20 ("Mr. Torres."). Upon hearing his name, Torres turned around and returned to Lucero's patrol vehicle.

---

[15]The traffic stop does not commence until timestamp 2:10 in the dashboard camera video. <u>See</u> Traffic Stop DVD at 2:10.

See Traffic Stop DVD at 11:21-11:25.  Lucero then asked Torres whether he could ask Torres more questions, see Traffic Stop DVD at 11:24-11:25, to which Torres responded, "sure," Traffic Stop DVD at 11:25.  Lucero proceeded to ask Torres additional questions about his travel plans, his relationship with Guerra, and his work for approximately the next two minutes.  See Traffic Stop DVD at 11:26-13:23.  Lucero subsequently approached the Ford Fusion SE also and asked Guerra whether she would mind answering some additional questions.  See Traffic Stop DVD at 13:40-13:43.  Guerra was seated at the time in the Ford Fusion SE's back seat, and her answer is not audible on the dashboard camera video, but she exited the vehicle to speak with Lucero.  See Traffic Stop DVD at 13:50-14:19.  Lucero brought Guerra in front of the Ford Fusion SE, outside of Torres' earshot but where Lucero maintained a line of sight over the vehicle roof with Torres, where he questioned Guerra for approximately five minutes about her and Torres' travel and relationship.  See Traffic Stop DVD at 14:25-19:11.  Lucero then returned to Torres, whom he again questioned for approximately a minute and a half, asking whether Torres had family in Amarillo, how much luggage he was carrying in his trunk, and whether a variety of illegal goods or substances were in the car.  See Traffic Stop DVD at 19:23-21:06.  In total, the amount of time between the moment that Lucero informed Torres that he was free to go after the traffic stop to the moment that Lucero requested Torres' consent for a vehicle search was nine minutes and forty-six seconds.  Compare Traffic Stop DVD at 11:20 (when Lucero called out "Mr. Torres"), with Traffic Stop DVD at 21:06 (when Lucero requested Torres' consent to search the vehicle).

According to Torres, this approximately ten minutes of additional questioning was based on an inchoate and unparticularized suspicion or hunch rather than on any reasonable suspicions. See Motion to Suppress at 14.  Consequently, Torres argues: (i) the questions unduly prolonged

the traffic stop and violated the Fourth Amendment; and (ii) all evidence that Lucero seized during the allegedly unlawful detention must be suppressed.  <u>See</u> Motion to Suppress at 14.  The United States counters that when Lucero asked Torres if he would agree to answer more questions, Torres returned to Lucero, thereby demonstrating that he voluntarily agreed to answer the additional questions.  <u>See</u> Response at 11.  As the United States sees it, the additional questioning was lawful if either: (i) a reasonable person in Torres' shoes would have felt free to leave without having answered Lucero's additional questions, and Torres thereby demonstrated voluntariness by staying to answer the questions; or (ii) Lucero had reasonable suspicion of a crime aside from the speeding infraction for which he stopped the Ford Fusion SE.  <u>See</u> Response at 12.

**A.    TORRES FREELY CONSENTED TO THE ADDITIONAL QUESTIONING AFTER THE TRAFFIC STOP HAD ENDED.**

The Court concludes that Torres demonstrated consent to continued questioning both in word and deed, because a reasonable person in his shoes should have felt free to leave.  Seconds before calling his name, Lucero informed Torres that he was free to leave, to which Torres responded "Alright. Thank you," and then immediately began to return to the Ford Fusion SE.  Traffic Stop DVD at 11:13-11:18.  When Torres reached the patrol vehicle and Lucero asked him whether he could ask Torres additional questions, Torres responded "sure."  Traffic Stop DVD at 11:25.  The Tenth Circuit has held that such verbal consent can be invalid as coerced if a balancing test including the following seven factors suggests that the patrol officer influenced the voluntariness of the consent: (i) the threatening presence of several officers; (ii) the brandishing of a weapon by the officer; (iii) some physical touching by the officer; (iv) aggression in the officer's language or tone; (v) prolonged retention of the motorist's personal effects; (vi) a request to accompany the officer to a police station; and (vii) interaction in a non-public place.

See United States v. Sanchez, 89 F.3d at 718. None of these factors was present at or before the time that Torres provided verbal consent to the continued questioning. See Traffic Stop DVD at 2:12-11:25.[16] Even though Lucero asked for and received Torres' permission to ask him additional questions, Lucero never explicitly explained to Torres that he was free to refuse to answer the questions. See Traffic Stop DVD at 11:25. Nevertheless, the Supreme Court has rejected requiring patrol officers to inform motorists of a right to refuse consent to additional questions. See Ohio v. Robinette, 519 U.S. 33, 39-40 (1996)("'While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.'")(quoting Schneckloth v. Bustamonte, 412 U.S. at 2048)). Subsequently, the Tenth Circuit has taken a further step by stating that this factor "should carry little weight" in the consent analysis. United States v. Thompson, 546 F.3d 1223, 1228 (10th Cir. 2008)(stating that "the officer's failure to advise Mr. Thompson should carry little weight in our analysis"). Given the lack of any evidence that Torres' verbal consent to additional questioning was invalid on the grounds that a reasonable person in Torres position would have felt coerced into providing this consent, the Court concludes that: (i) there was no such coercion; and (ii) Torres' verbal consent was freely given.

**B.  LUCERO HAD OBJECTIVELY REASONABLE SUSPICION OF CRIMINAL ACTIVITY AND, THEREFORE, LAWFULLY COULD DETAIN TORRES AFTER THE TRAFFIC STOP HAD ENDED.**

The Court concludes that Torres freely consented to additional questioning after the traffic stop had ended. Even if, however, Torres had not provided that voluntary consent, Lucero's objectively reasonable suspicion of criminal activity would have made the detention for additional questions lawful. Such reasonable and articulable suspicion of criminal activity

---

[16]At one point, while Lucero was writing the speeding citation, Torres even volunteered that Lucero was "a lot nicer than the cops in California." Traffic Stop DVD at 8:38-8:40.

makes it lawful for a patrol officer to detain a motorist beyond the scope of a traffic stop. See United States v. Rosborough, 366 F.3d at 1148. In United States v. Davis, the Tenth Circuit identified various factors that may contribute to a reasonable suspicion of a criminal act during a traffic stop, including: (i) internally inconsistent statements; (ii) inconsistent statements concerned travel plans between a driver and his or her passengers; (iii) unusual signs of nervousness during a stop; (iv) evasiveness; (v) previous criminal history; (vi) driving a rental vehicle; and (vii) having bizarre travel plans See United States v. Davis, 636 F.3d at 1291-92.

The Tenth Circuit has held that a patrol officer may base his or her assessment whether any of the above factors is suspicious on his or her training and experience, and that a district court should accord deference to an officer's ability to distinguish between innocent and suspicious actions. See United States v. Gandara-Salinas, 327 F.3d at 1130 (citing United States v. Brignoni-Ponce, 422 U.S. 873, 884-85 (1975); United States v. De la Cruz-Tapia, 162 F.3d 1275, 1277 (10th Cir. 1998)). Based on his experience and training as a patrol officer, Lucero determined that factors such as (i) a thirty-hour roundtrip car drive for a two-day vacation in a city with no discernible tourist attractions; (ii) Torres' rapid rate of travel from California to New Mexico; (iii) Torres' nervousness; (iv) Torres' and Guerra's lack of hotel accommodations for the coming evening; (v) Guerra's lack of knowledge where she and Torres were heading; and (vi) an overpowering smell of air freshener in the Ford Fusion SE all -- when combined, constituted suspicious behavior. See Tr. at 70:5-72:6 (Lucero). If it were the patrol officer, the Court would not necessarily consider some of these factors to be indicia of hidden criminal conduct. For instance, many travelers wait until they reach their destination and then book a hotel room last minute to take advantage of hotels' willingness to drop their prices to fill empty rooms. The Tenth Circuit instructs, however, that district courts are to accord deference to an

- 65 -

officer's ability to detect suspicious behavior during a traffic stop.  See United States v. Gandara-Salinas, 327 F.3d at 1130.  During the hearing, Torres' expert testified that patrol officers develop a sixth sense for suspicion as they stop hundreds of motorists over years on the job.  See Tr. at 87:21 (Garcia).  The Court therefore concludes that there is no sound reason to override the deference normally accorded to patrol officers in determining reasonable suspicion, and the Court consequently concludes that Lucero had reasonable suspicion to detain Torres even if Torres had not given his verbal consent to additional questioning.

## III.    TORRES VOLUNTARILY CONSENTED TO THE VEHICLE SEARCH.

Torres argues that his consent to search the Ford Fusion SE was involuntarily, because: (i) Torres' consent was not freely given to Lucero to either ask him additional questions after the vehicle stop ended or to search the Ford Fusion SE; and (ii) the detention was so excessive that the Court should suppress evidence from the vehicular search under Rodriguez v. United States. The Court concludes that Torres does not meet his burden to prove either of these prongs.  The Court therefore concludes that the search was not unconstitutional under Rodriguez v. United States and denies Torres' request that it suppress the evidence resulting from the vehicular search.

Without unlawful seizure, the United States need not prove "a sufficient attenuation or break in the causal connection between the illegal [stop] and the consent."  United States v. Salas, 756 F.3d at 1203 (quoting United States v. Fox, 600 F.3d at 1257).  Instead, it must show that: (i) "consent was unequivocal and specific and freely given"; and (ii) "consent was given without duress or coercion, express or implied."  United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007).  Torres gave consent; the issue is whether he gave consent freely and

voluntarily. See Florida v. Rover, 460 U.S. at 297. Torres contends that a reasonable person would not feel at liberty to decline consent to a search. See Motion to Suppress at 24-25.

After the traffic stop ended, Torres voluntarily agreed to answer further questions that Lucero posed to him. Tenth Circuit precedent demonstrates that, when Lucero returned Torres' documents, he ended the detention as long as he did not constrain Torres with an overbearing show of authority. See United States v. West, 219 F.3d at 1176 ("A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority.") Here, Torres signed the citation, stated that he had no further questions, and began to return to the Ford Fusion SE. See Traffic Stop DVD at 10:06-11:19. Affirming that Torres had no additional questions -- alongside the return of Torres' documents with the citation and Torres' turning to return to the Ford Fusion SE -- all signpost that Torres' encounter with Lucero regarding the traffic stop had ended. See United States v. Hernandez, 93 F.3d at 1499. Furthermore, lest there be any ambiguity about whether the encounter had terminated, Lucero told Torres that he was free to go. See Traffic Stop DVD at 11:12-11:13. As the Tenth Circuit has held, a traffic stop's encounter has terminated if a motorist obtains his or her documents and walks away from a patrol officer after the officer has told the motorist that he or she is free to leave. See United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992)("As long as a reasonable innocent person . . . would feel free to leave, such encounters are consensual . . . .")

Only a few moments passed between the time that Lucero told Torres that he was free to leave and the time that Lucero addressed Torres again. See Traffic Stop DVD at 11:13-11:20. Nevertheless, the Tenth Circuit has concluded that a traffic stop ended and a consensual encounter began when only a handful of seconds passes between two events. See United States

v. Hernandez, 93 F.3d at 1499 (concluding that a consensual encounter began within seconds of the officer handing the motorist his license and registration). As Torres was returning to his car, Lucero did not address or otherwise call out to Torres with an overbearing, obtrusive tone; Lucero only politely and at normal volume called Torres' name. See Traffic Stop DVD at 11:13-11:20. Torres returned to Lucero's vehicle, where Lucero again used a polite tone to ask Torres if Lucero could ask him a few additional questions. See Traffic Stop DVD at 11:21-11:25. Torres voluntarily returned to Lucero's police vehicle and agreed to answer further questions. See United States v. Hernandez, 93 F.3d at 1499. Accordingly, the detention had ended, and Torres voluntarily agreed to answer Lucero's questions.

Torres does not contest that he gave verbal and written consent to Lucero to search the Ford Fusion SE. See Motion to Suppress at 19, 23; Tr. at 99:14-100:11 (Pori). During the hearing, Torres' own witness told the Court that during his twenty-two years as a detective with the Albuquerque Police Department -- during which time he made hundreds of traffic stops that resulted in searches -- he had never doubted that a motorist consented to a vehicle search when the motorist provided written consent. See Tr. at 88:1-89:3 (Torrez, Garcia). Torres nevertheless asserts that he and Guerra represent the black swans that his own witness never has seen: a motorist whose written consent is not really consent, because it was involuntary. See Tr. at 100:7-11. The Court disagrees with Torres' assessment. Under the balancing test that the Tenth Circuit uses to determine whether consent to a vehicle search is voluntarily given, the Court concludes that Torres voluntarily consented to a search of the Ford Fusion SE.

In United States v. Sanchez, the Tenth Circuit held that consent to a vehicle search is voluntarily given only when two criteria are met: (i) the consent must be unequivocally, specifically, and intelligently given; and (ii) the patrol officer must not have impliedly or

expressly coerced the motorist into consenting or have placed the motorist under any duress.  See 89 F.3d at 690.  The dashboard camera footage of Torres' traffic stop leaves no doubt that Torres' consent met the first of these two criteria.  When Lucero presented Torres with the vehicle consent form, he asked whether Torres could "read English fine," to which Torres responded that he could.  Traffic Stop DVD at 22:15-17.  Lucero then instructed Torres: "Then what I need you to do is read from this spot to right here, okay?  If you don't have no [sic] questions, concerns, and you're okay with it, you can print your name right here and sign right here and date [sic] the date."  Traffic Stop DVD at 22:17-33.  Torres then spent approximately thirty seconds reading and contemplating the 121 words in the English version of the vehicle search consent form -- a rate of approximately 240 words per minute.  Compare Traffic Stop DVD at 22:33-23:03, with Search and Seizure Vehicle Consent to Search Form, filed Feb. 15, 2017 (Government Exhibit 2).  This reading rate lies within the golden reading comprehension zone of 100-275 words per minute when reading comprehension in an average adult is maximal.  Compare, e.g., Ronald P. Carver, Optimal Rate of Reading Prose, 18 Reading Research Quarterly 56-88 (1982)(setting lower threshold for the golden zone at one hundred words per minute), with Gordon E. Legge et al., Psychophysics of Reading, 4 Clinical Vision Science 51-60 (1989)(setting upper threshold for the golden zone at 275 words per minute).  After reading through the consent form, Torres showed that he understood the import of what he read, asking Lucero what would happen if Torres refused to consent to the search.  See Traffic Stop DVD at 22:58-22:59.  Then, with no more prodding from Lucero evident from the stop's audio beyond pointing out to Torres where to sign the date on the consent form, Torres signed the consent form.  See Search and Seizure Vehicle Consent to Search Form at 1.  Based on the

circumstances' totality, the Court concludes that Torres' consent was unequivocal, specific, and intelligently given.

Torres argues, however, that his consent did not satisfy the second criterion under United States v. Sanchez, alleging that the patrol officer coerced Torres into consenting to the vehicle search. See Motion to Suppress at 23-25. Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances. See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources). Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer." United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original). See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010). The inquiry is an objective one. See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003). "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

Applying the seven factors from United States v. Ledesma and United States v. Anderson to this case's facts, the Court concludes that there is no evidence that a reasonable person in Torres' shoes would have felt coerced into signing the vehicle consent form.  First, the Court does not see any evidence of the threatening presence of several officers.  The state patrol vehicle parked in front of the Ford Fusion SE until 8:45 on the dashboard camera's video's

timestamp (i) already was parked on the side of the road when Torres parked the Ford Fusion SE multiple car lengths behind it in response to Lucero's siren and lights, see Traffic DVD at 1:57-2:07; (ii) at no point while on camera does Torres look in the direction of the state patrol vehicle before it departs, see Traffic DVD at 2:56-8:45[17]; and (iii) no officer ever emerged from the state patrol vehicle, see Traffic DVD at 2:07-8:45. The Court notes that a second officer appeared on the scene while Lucero was removing some of the Ford Fusion SE's contents, on what Torres testified at the evidentiary hearing was a wellness check. See Traffic Stop DVD at 26:32. Linguistically, the presence of a second officer does not qualify as the presence of "several" officers on the scene. Merriam-Webster, Several, https://www.merriam-webster.com/dictionary /several (last visited June 6, 2017)(defining "several" as "an indefinite number more than two and fewer than many). Furthermore, the second officer arrived approximately three minutes after Torres signed the vehicle consent to search form. Compare Traffic Stop DVD at 23:36, with Traffic Stop DVD at 26:32. It is not reasonable to conclude that the future presence of a second officer made Torres feel coerced into signing the vehicle consent form.

The Court also finds no evidence of coercion under the second factor. The Court has listened to the dashboard camera audio multiple times. At no point during footage that lasts for half an hour has the Court identified any moment when Lucero adopted an aggressive tone or used aggressive language when interacting with Torres. To the contrary, up to the point that Torres signed the consent form, Lucero referred to Torres with the honorific "sir" five times, always referred to Torres as "Mr. Torres," and maintained an even tone of voice. Traffic Stop

---

[17]Even when Lucero approaches the Ford Fusion SE to speak with Guerra, which would first create a straight line of sight between Torres and the state police vehicle if Torres' eyes were following Lucero and thereafter put the state patrol vehicle in Torres' peripheral vision, Torres turns his body toward Lucero but gazes off to his left. See Traffic Stop DVD at 6:25-6:36.

DVD 2:32-24:05.  During the interactions after Lucero questioned Guerra and immediately before Torres signed the consent form, Lucero repeatedly used modal verbs and the counterfactual conditional mood for all of his main verbs, a periphrasis that in English usage is interpreted as being softer and gentler than the simple future tense that Lucero could have chosen to employ instead.  See Traffic Stop DVD at 21:03-23:11. The Court, in a word, cannot discover even the slightest edge in Lucero's voice -- let alone any aggressive language -- in Lucero's interaction with Torres.

The Court sees no evidence of coercion under the third factor: prolonged retention of a person's personal effects such as identification.  Lucero relinquished control of all Torres' papers and his identification early during the traffic stop.  See Traffic Stop DVD at 7:07.  One might could interpret even such a rapid completion of the traffic stop involved, however, prolonged document retention that led to Torres feeling coerced when he signed the consent form sixteen minutes later.  Justice Ginsburg in Rodriguez v. United States seems to suggest, however, that such an interpretation would be incorrect.  In her majority opinion, Justice Ginsburg holds that a seven to eight minute delay after the motorist's papers and identification have been returned constitutes a Fourth Amendment violation.  She does not hold, however, that the twenty-one or twenty-two minutes that the patrol officer in the case held onto the motorist's identification and documents before the delay were evidence of any coercion.  Compare 135 S. Ct. at 1613 (reporting a delay of seven or eight minutes after the motorist received his papers and identification), with Rodriguez v. United States, 135 S. Ct. 1609, 1617 (2015)(Thomas, J.)(dissenting)(reporting that the total time of the stop with the delay was twenty-nine minutes).  If the Supreme Court does not consider more than twenty minutes to be a prolonged retention of a motorist's identification and papers in a case like Rodriguez v. United States that also involved

a minor traffic infraction -- drifting out of one lane late at night -- then the Court can find no sound reason for concluding that retention of Torres' papers and identification for less than half that time was so prolonged so as to make Torres feel coerced into signing a vehicle search consent form sixteen minutes after the return of those papers and identification.

The Court also sees no evidence of coercion under the remaining four factors. The traffic stop was in a public place: on the shoulder of Interstate 40 in broad daylight shortly after the end of weekday rush hour in a city with more than half a million residents. See Traffic Stop DVD 1:46-48:10; United States Census Bureau, Annual Estimates of the Resident Population: 2016 Population Estimates, https://factfinder.census.gov/faces/tableservices/jsf/pages /productview.xhtml?src=bkmk (last visited June 6, 2017)(reporting an estimated population for Albuquerque of 559,277 persons as of July 1, 2016). Lucero advised Torres that he was free to leave at the end of the traffic stop, see Traffic Stop DVD at 11:13 ("Alright, you're free to go."), and that he was free to refuse to sign the consent form, see Traffic Stop DVD at 23:12-23:14 ("It's totally up to you. It's your choice."). At no time did Lucero unholster or otherwise brandish his firearm. See Traffic Stop DVD at 1:46-48:10. Lucero physically touched Torres when searching him for weapons, but he patted Torres down only after Torres had signed the vehicle search consent form. See Traffic Stop DVD at 23:14-23:57. In the absence of any evidence that Torres signed the vehicle search consent form under coercion or duress, the Court therefore concludes that there was no coercion or duress. Consequently, the Court concludes that Torres' verbal and written consent to search the Ford Fusion SE was voluntary, and the vehicle search therefore was not a Fourth Amendment violation.

**IT IS ORDERED** that Defendant Edwin Torres' Motion to Suppress Evidence, filed December 8, 2016 (Doc. 18), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Presiliano Torrez
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Brian A. Pori
  Federal Public Defender
Office of the Public Defender
Albuquerque, New Mexico